**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John Michael PERKINS, Defendant–
Appellant.**

No. 03–4008.

United States Court of Appeals,
Fourth Circuit.

Argued: Oct. 29, 2003.

Decided: April 7, 2004.

**ARGUED:** Jonathan David Byrne, Legal Research and Writing Specialist, Charleston, West Virginia, for Appellant. Karen B. George, Office of the United States Attorney, Charleston, West Virginia, for Appellee. **ON BRIEF:** Mary Lou Newberger, Federal Public Defender, George H. Lancaster, Jr., Assistant Federal Public Defender, Charleston, West Virginia, for Appellant. Kasey Warner, United States Attorney, Joshua C. Hanks, Assistant United States Attorney, Charleston, West Virginia, for Appellee.

Before WILKINSON, MICHAEL, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the majority opinion, in which Judge SHEDD joined. Judge MICHAEL wrote a dissenting opinion.

## OPINION

WILKINSON, Circuit Judge:

Appellant John Michael Perkins was stopped in his vehicle by police officers in St. Albans, West Virginia on May 5, 2002. As they approached the vehicle, one of the officers observed a rifle lying in the back seat of Perkins' car. After Perkins volunteered that he had a prior felony, the officer arrested Perkins and found knives, drug paraphernalia, and two other guns in the car. Perkins was charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (2000). Following the district court's denial of Perkins' pretrial motion to suppress the evidence, Perkins entered a conditional plea of guilty. On appeal, Perkins renews his motion to suppress, arguing that the investigative stop of his vehicle violated his Fourth Amendment right to be free from unreasonable searches and seizures. Because we find that the officers had reasonable suspicion to stop Perkins' car in view of the totality of the circumstances, we affirm.

### I.

In the evening hours of May 5, 2002, an unidentified woman called the St. Albans, West Virginia police department and reported that there were two white males in the front yard of a duplex at 2740 Knox Avenue who were pointing and displaying rifles in various directions. She further reported that the men had arrived in a red car bearing a silver or white stripe. The dispatcher relayed all of this information to officers in the area.

Officer Mark Burdette and Sergeant T.A. Kemper were patrolling the area in separate units, and they responded to the call. Officer Burdette had been with the St. Albans police department for seven years and was familiar with the Knox Avenue area. He knew that Knox Avenue, a residential street where young children are commonly present, was a notorious high crime and drug trafficking area. Officer Burdette previously had participated with the police department's drug unit in four or five drug investigations on Knox Avenue and more in the surrounding area. In fact, Officer Burdette knew that 2740 Knox Avenue—the very unit where the caller had reported the disturbance—was one unit in a two-unit duplex, and that the other unit, 2738 Knox Avenue, was a known drug house and was presently un-

der investigation for drug activity. Officer Burdette had personally arrested both of the female residents of 2738 Knox Avenue on several occasions for drug-related offenses. When Officer Burdette received the information from the dispatcher, he surmised that it was a "drug deal gone bad."

Although the caller did not identify herself, Officer Burdette believed that she was Mrs. Hayes, a woman who lived across the street from the duplex at 2738 and 2740 Knox Avenue. Officer Burdette stated that this belief was based on the detailed nature of the caller's description of the individuals and their conduct, which revealed that she was in "close proximity" to them. Officer Burdette knew that Mrs. Hayes lived "directly across the street" from the duplex. Moreover, he knew that she "normally is the one who calls in and complains and gives reliable information." Indeed, Officer Burdette testified, just in the instances in which he was involved, Mrs. Hayes had called and provided reliable information of drug or other illegal activity on Knox Avenue on at least six to ten prior occasions. Officers later confirmed that Mrs. Hayes was in fact the caller.

Officers Burdette and Kemper arrived at the duplex and found two vehicles parked in front of it. Officer Burdette pulled up behind them and identified the vehicle described by the caller, a small red car with a silver or white stripe. He saw two men in the car and found that they met the caller's description. He further recognized the passenger in the car as Mark Freeman, a "known drug taker" who lived on Knox Avenue. Moments later, the red car described by the caller pulled out from in front of the duplex and began driving off. Officer Burdette advised Sergeant Kemper that the red car was the vehicle that was described to them, and

the officers initiated a traffic stop of the vehicle.

As the officers approached the car, Officer Burdette saw a loaded, high-powered rifle lying in plain view in an open gun case on the back seat. Perkins explained that he was trying to sell guns for his wife and openly volunteered that he had a felony conviction. Upon confirming with a dispatcher that Perkins had several prior felonies, Officer Burdette placed Perkins under arrest. Perkins consented to a search of his vehicle, and the officers discovered two more loaded guns, knives, and a variety of drug paraphernalia.

A grand jury indicted Perkins on one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (2000). Perkins filed a pre-trial motion to suppress the evidence seized during the investigative traffic stop. After an evidentiary hearing, the district court denied the motion. Perkins subsequently entered a conditional plea of guilty, and the district court sentenced Perkins to forty-one months in prison followed by a three-year term of supervised release. Perkins now appeals, claiming that the district court erred in denying his suppression motion.

II.

When considering on appeal a motion to suppress evidence, we review a district court's factual findings for clear error and its legal determinations de novo. *United States v. Johnson*, 114 F.3d 435, 439 (4th Cir.1997). Because the district court denied the motion to suppress, we construe the evidence in the light most favorable to the government. *See United States v. Seidman*, 156 F.3d 542, 547 (4th Cir.1998).

We hold that the totality of the circumstances here justified Officer Burdette's

decision to stop Perkins' vehicle. We first detail our basis for finding that reasonable suspicion existed, and then we address Perkins' specific objections.

### III.

 Under *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an officer may conduct a brief investigatory stop where the officer has reasonable suspicion that criminal activity may be afoot. *See Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir.1989). A *Terry* stop must be based on "at least a minimal level of objective justification," but the standard for reasonable suspicion is less demanding than for probable cause. *Wardlow*, 528 U.S. at 123, 120 S.Ct. 673.

 In assessing a *Terry* stop's validity, we consider the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Crittendon*, 883 F.2d at 328. Thus, factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together. *United States v. Arvizu*, 534 U.S. 266, 274–75, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *Sokolow*, 490 U.S. at 9–10. Moreover, our determination of reasonable suspicion must give due weight to common sense judgments reached by officers in light of their experience and training. *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673. While we require more than a mere "hunch" to justify a stop, we also credit the "practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993); *see also Arvizu*, 534 U.S. at 273–74, 122 S.Ct. 744.

At the time he stopped Perkins' vehicle, Officer Burdette knew the following facts: (1) Knox Avenue was a high-crime, drug-ridden neighborhood in which children were commonly present; (2) he had taken part in four or five drug investigations on Knox Avenue; (3) the duplex at 2740 Knox Avenue was a known drug house under investigation by the police's drug unit; (4) Officer Burdette had personally arrested the residents of one of the units in that duplex on several occasions; (5) an unnamed caller had reported observing two white males pointing rifles in various directions in the front yard of that duplex; (6) these men reportedly arrived in a red car with a silver or white stripe; (7) Mrs. Hayes, a resident who lived directly across the street from the duplex, normally reported this type of conduct to the police; (8) Mrs. Hayes had given reliable information about illegal activity in this area at least six to ten times before; (9) shortly after the phone call to the police, there were indeed two white males in a red car bearing a silver or white stripe, parked next to another car right outside the duplex at 2740 Knox Avenue; (10) the passenger in the car was Mark Freeman, a well-known drug purchaser who lived in the neighborhood; and (11) the red car pulled away when the officers arrived.

 In view of these circumstances, we find that Officer Burdette had reasonable suspicion to stop Perkins' car. Officer Burdette was intimately familiar with the Knox Avenue neighborhood. He knew it to be a high crime and drug trafficking area. *See Wardlow*, 528 U.S. at 124, 120 S.Ct. 673. His personal experience investigating drug activity on Knox Avenue and at the particular duplex in question, and his awareness that the duplex was under police investigation as a known drug house, are also important factors in the analysis. Officer Burdette's knowledge and experience reasonably led him to conclude that the situation was potentially dangerous and drug-related. *See Arvizu*,

534 U.S. at 275–77, 122 S.Ct. 744 (stressing the importance of respecting police officers' assessments of situations in light of their experience with particular areas and types of illegal activity).

■■■ Moreover, Officer Burdette was justified in relying upon the tip as part of his basis for reasonable suspicion. The tip itself made clear both that the caller was in close proximity to the duplex and that the caller personally had observed the men. The tipster's basis of knowledge—a contemporaneous viewing of the suspicious activity—enhanced the tip's reliability. *See Florida v. J.L.*, 529 U.S. 266, 270–72, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (noting the usefulness of verifying an informant's basis of knowledge). Officer Burdette reasonably assumed that Mrs. Hayes was the caller, because Mrs. Hayes resided directly across from the duplex and because she was known to Officer Burdette as a regular and reliable informant concerning this type of conduct in the Knox Avenue area. *See id.* (noting the usefulness of verifying an informant's credibility). While it is conceivable that the caller could have been another (perhaps less reliable) resident, as Perkins contends, Officer Burdette's assumption that it was Mrs. Hayes was reasonable under the circumstances, and we cannot demand scientific certainty from officers under a *Terry* analysis. *See Wardlow*, 528 U.S. at 125, 120 S.Ct. 673.

Before deciding to make an investigative stop, Officer Burdette confirmed important aspects of the tip. The fact that he found the two white males in a red car with a silver or white stripe at the precise duplex reported, just as the caller had described, offers important corroboration of the tip. *See United States v. Perrin*, 45 F.3d 869, 873 (4th Cir.1995); *see also United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir.2003) ("[P]olice observation of an individual, fit-

ting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch."). In addition, Officer Burdette identified the passenger in the car as a known drug user who lived on Knox Avenue, which further reinforced his suspicions of possible drug activity. *See id.; see also United States v. Feliciano*, 45 F.3d 1070, 1074 (7th Cir. 1995) ("Knowledge of . . . recent relevant criminal conduct . . . is a permissible component of the articulable suspicion required for a *Terry* stop."). Only upon observing these details did Officer Burdette initiate the traffic stop, and only after the car had pulled away from the duplex upon his arrival. *See Alabama v. White*, 496 U.S. 325, 331–32, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (emphasizing the importance of corroborative efforts by officers). The totality of the circumstances plainly supported Officer Burdette's decision to stop Perkins' vehicle.

The dissent's recitation of this scene in its opening paragraph simply bears no resemblance to the situation that confronted Officer Burdette. In fact, our dissenting brother fails even to mention the fact, among others, that the rifles were displayed right in front of a duplex well known for its drug activity. And in its efforts to second-guess Officer Burdette at every turn, the dissent engages in sheer speculation about what "it appears" might have been the case. *See post* at 18, 20. In point of fact, Officer Burdette reacted to the circumstances before him with a measured response. This case does not involve any intrusion into the home or other areas that rightfully deserve the greatest Fourth Amendment scrutiny. It concerns rather a preliminary stop of an automobile in order to investigate clearly suspicious activity. Only after Officer Burdette saw

a high-powered rifle in plain view in the vehicle, and Perkins then offered that he was a past felon, did the encounter advance to a full-scale arrest. At that point, Officer Burdette found a veritable arsenal of guns and an array of drug paraphernalia in the car. This was a reasonable, measured police response to a suspicious set of circumstances, which is precisely what *Terry* was designed to allow.

## IV.

Perkins' principal objection is that the call to the police was an anonymous tip that was not sufficiently corroborated as required by the Supreme Court in *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). Therefore, Perkins claims, the tip could not form the basis for the investigatory stop, and Officer Burdette could not possess reasonable suspicion to stop Perkins' vehicle.

As an initial matter, it is not even clear whether this was a purely anonymous tip. It obviously had some characteristics of an anonymous tip because the woman did not give her name to the dispatcher. On the other hand, as detailed above, Officer Burdette reasonably assumed the caller's identity to have been Mrs. Hayes, and it was the nature and substance of the tip that revealed her identity. While an "anonymous" caller may be defined simply as one who does not identify herself, she could just as plausibly be defined as one who is unknown to the police. Such a definition, by focusing on the officer's knowledge, would be consistent with the officer-centered nature of reasonable suspicion analysis. Neither the Supreme Court nor this court has defined precisely what it means to be an "anonymous" caller.

We need not resolve that issue here, however. Even if the tip is deemed "anonymous," we still conclude that Officer Bur-

dette had reasonable suspicion to stop Perkins' vehicle.

## A.

The basic rules governing informant's tips are well-established. In cases where an informant's tip supplies part of the basis for reasonable suspicion, we must ensure that the tip possesses sufficient indicia of reliability. *See J.L.*, 529 U.S. at 270, 120 S.Ct. 1375; *Alabama v. White*, 496 U.S. 325, 326–27, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Where the informant is known or where the informant relays information to an officer face-to-face, an officer can judge the credibility of the tipster firsthand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion. *See Adams*, 407 U.S. at 146–47, 92 S.Ct. 1921 (tip from known source); *United States v. Christmas*, 222 F.3d 141, 144 (4th Cir.2000) (face-to-face tip from unknown source). Where a tip is anonymous, it must be accompanied by some corroborative elements that establish the tip's reliability. *See J.L.*, 529 U.S. at 270, 120 S.Ct. 1375; *White*, 496 U.S. at 329–31, 110 S.Ct. 2412. In fact, the Supreme Court has made clear that "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *J.L.*, 529 U.S. at 270, 120 S.Ct. 1375 (internal quotation omitted).

Under the circumstances of this case, for the reasons we have given, the tip was sufficiently reliable to be part of Officer Burdette's basis for stopping Perkins' vehicle. This case is unlike *Florida v. J.L.*, in which Miami–Dade police officers, responding to a purely anonymous call reporting that "a young black male standing at a particular bus stop and wearing a

plaid shirt was carrying a gun," found a male meeting that description and searched him and his two friends, based solely on the tip. 529 U.S. at 268, 120 S.Ct. 1375. In holding the search unconstitutional, the *J.L.* Court emphasized that "nothing [was] known about the informant" and that, "apart from the tip, the officers had no reason to suspect any" of the men they searched of any illegal or suspicious conduct. *Id.* Indeed, the Court distinguished prior case law by high-lighting that the stop and frisk in *J.L.* resulted "not from any observations of [the officers] but solely from a call made from an unknown location by an unknown caller." *Id.* at 270, 120 S.Ct. 1375. Thus, the Court held that there were insufficient indicia of reliability to support the tip, focusing in particular on the lack of information that would demonstrate the tipster's credibility or basis of knowledge. *Id.* at 271, 120 S.Ct. 1375.

█ In the present case, by contrast, Officer Burdette did not rely solely upon a call made by an unknown person from an unknown location. Quite the opposite, the caller revealed her general location and her basis of knowledge, as the nature and substance of her tip made clear that she was in close proximity to the men and that she was observing them while she was on the phone. The caller was not entirely unknown, as Officer Burdette reasonably assumed that it was Mrs. Hayes. The dissent would have us ignore entirely Officer Burdette's reasonable assumption as to the caller's identity. *See post* at 330–31. Its view that tips fall into two stark categories that are wholly anonymous or wholly non-anonymous is inconsistent both with reality and with Fourth Amendment law. For in reality, tips fall somewhere on a spectrum of reliability, and under the Fourth Amendment a reviewing court may—indeed must—take into account all

the facts surrounding a tip in assessing the totality of the circumstances supporting a stop. The fact that a tip may be anonymous does not mean that in assessing the tip's reliability we then ignore salient facts such as an officer's reasonable and informed judgments as to the identity of a caller. And here the tip was not the sole basis for the *Terry* stop, as Officer Burdette confirmed the tip's reliability with his own knowledge of the area and with his own observations upon arriving at the scene.

Unlike in *J.L.*, Officer Burdette suitably corroborated the tip, and it was accompanied by a number of other relevant factors that indicated the potential for criminal activity. The tip, whether "anonymous" or not, carried sufficient indicia of reliability to form part of Officer Burdette's reasonable suspicion. We cannot say under these circumstances that he was unjustified in conducting the *Terry* stop.

### B.

Perkins protests, however, that in this case there was no predictive information contained in the tip which was confirmed by the officers. In suppressing the evidence in *J.L.*, the Court focused on the lack of any predictive information in the tip, thus distinguishing *Alabama v. White*, 496 U.S. at 332, 110 S.Ct. 2412, in which an anonymous tip was corroborated by police surveillance that confirmed some of the tipster's predictions. *See J.L.*, 529 U.S. at 270–71, 120 S.Ct. 1375. The Ninth Circuit has relied on these cases in ruling that "in order for an anonymous tip to serve as the basis for reasonable suspicion," a tip "must predict the suspect's future movements[, and] the future movements must be corroborated by independent police observation." *United States v. Morales*, 252 F.3d 1070, 1076 (9th Cir.2001).

█ However, in neither *White* nor *J.L.* did the Court hold that confirmation

of predictive information is the only way to assess the reliability of an anonymous tip. The central point in those cases is that courts must ensure, one way or the other, that an anonymous informant's tip was sufficiently reliable. *White*, 496 U.S. at 330–31, 110 S.Ct. 2412; *J.L.*, 529 U.S. at 270, 120 S.Ct. 1375. As Justice Kennedy made clear in his concurring opinion, "there are many indicia of reliability respecting anonymous tips" that may suffice. *Id.* at 274, 120 S.Ct. 1375 (Kennedy, J., concurring). For example, Justice Kennedy noted, in some cases "experience [with a particular anonymous informant] cures some of the uncertainty surrounding the anonymity, justifying a proportionate police response." *Id.* at 275, 120 S.Ct. 1375 (using the example of an anonymous informant who calls in successive reports with a recognizable voice). A rigid rule demanding the presence of predictive information is thus unjustified by *White* and *J.L.*, and it would be wholly inconsistent with the flexible nature of reasonable suspicion analysis. *See United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ("The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.'") (quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)); *see also United States v. Arvizu*, 534 U.S. 266, 274–75, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

Furthermore, the need to focus on predictive information in order to corroborate an anonymous tip, while perhaps present in *White* and *J.L.*, does not exist in this case. In both *White* and *J.L.*, the tip alleged concealed and possessory criminal activity. The nature of a status crime such as possession of a concealed firearm may require corroboration of the extent of the tipster's inside information, in order to ensure that the tipster was in a position to know about the alleged illegal conduct. It

was therefore understandable for the Court to focus on the factor of predictive information in those cases. *See White*, 496 U.S. at 327, 331–32, 110 S.Ct. 2412; *J.L.*, 529 U.S. at 268, 270–72, 274, 120 S.Ct. 1375.

Here, by contrast, the tip alleged that two males were displaying and pointing rifles in various directions in a residential neighborhood. The caller in this case was clearly in a position to know about the reported activity that gave rise to Officer Burdette's suspicion. In this different context, where the suspicious activity is openly and readily observable, other manners of corroborating a tip are entirely legitimate. *Cf. United States v. Wheat*, 278 F.3d 722, 734 (8th Cir.2001) ("Unlike with clandestine crimes such as possessory offenses, ... where corroboration of the predictive elements of a tip may be the only means of ascertaining the informant's basis of knowledge, in erratic driving cases the basis of the tipster's knowledge ... comes from his eyewitness observations, and there is no need to verify that he possesses inside information.").

■ Where, as here, an officer had "objective reason to believe that [a] tip had some particular indicia of reliability," *id.* at 276, 120 S.Ct. 1375 (Kennedy, J., concurring), the tip can rightfully support an officer's decision to investigate further, even without the presence of predictive information. *Accord United States v. Nelson*, 284 F.3d 472, 483–84 (3d Cir.2002) (noting that while "predictive information can demonstrate particularized knowledge [as required in *White* and *J.L.*], other aspects of the tip can reflect particularized knowledge as well."); *United States v. Tucker*, 305 F.3d 1193, 1201 (10th Cir. 2002) (noting that "while the police did not corroborate predictive details in the tip," this "lack of corroboration is not fatal");

*Wheat,* 278 F.3d at 734 (noting that *"White* did not create a rule *requiring* that a tip predict future action, and neither did *J.L."*) (emphasis in original) (internal citation omitted)); *United States v. Johnson,* 64 F.3d 1120, 1125 and n. 3 (8th Cir.1995) (noting that *Alabama v. White* "does not create a rule requiring that a tip predict future action," and pointing out that such a rule would be inconsistent with the totality-of-the-circumstances approach to determining reasonable suspicion).

### C.

Perkins further objects that permitting reliance upon anonymous tips may lead to problems of mischief and harassment, as individuals can fabricate reports to the police as pranks or as a way of harming their enemies. *See White,* 496 U.S. at 333, 110 S.Ct. 2412 (Stevens, J., dissenting). This danger is obviated, however, by the requirement in *J.L.*—to which we adhere—that a tip must carry sufficient indicia of reliability in order to be part of an officer's basis for reasonable suspicion. Where an officer is able to verify the reliability of a tip before acting upon it, the dangers of harassment are greatly minimized.

There is the equal danger, moreover, that according no weight to "anonymous" tips in the reasonable suspicion calculus will undermine the ability of concerned residents to report illegal activity and to thereby make their neighborhoods more safe. Residents of neighborhoods are in the best position to monitor activity on the streets. But residents, also fearful of the consequences, may not always wish to identify themselves and volunteer their names. According no weight as a matter of law to such "anonymous" tips would only discourage concerned residents from even calling the police, would burden the rights of ordinary citizens to live in their neighborhoods without fear and intimidation, and would render citizens helpless in their efforts to restore safety and sanctity to their homes and communities. *Cf. United States v. Christmas,* 222 F.3d 141, 145 (4th Cir.2000). The Fourth Amendment touchstone of "reasonableness" rejects such absolute and per se rules, and encourages the practical and particularized review of stops and searches which we have undertaken here. *See Illinois v. Gates,* 462 U.S. 213, 230–35, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *White,* 496 U.S. at 328–29, 110 S.Ct. 2412. We cannot interpret that Amendment in a manner that severs the connection between citizens and the most basic services of their government, here the provision of public safety and personal protection.

### V.

Perkins' final claim is that Officer Burdette's reasonable suspicion did not relate to any *illegal* conduct. Even if Officer Burdette was reasonable to believe that Perkins engaged in the conduct reported by the caller, Perkins contends, there was no reason for Officer Burdette to suspect Perkins of criminal activity, as the informant's tip reported only open gun possession—a legal activity in West Virginia—and the officers did not observe any illegal conduct.

Perkins misunderstands the nature of the reasonable suspicion inquiry. Officers are not required under *Terry* to have reasonable suspicion of ongoing illegal activity in order to make investigative stops. Indeed, the very point of *Terry* was to permit officers to take preventive action and conduct investigative stops *before* crimes are committed, based on what they view as suspicious—albeit even legal—activity. *See Illinois v. Wardlow,* 528 U.S. 119, 125–26, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Whereas the prevail-

ing probable cause standard is whether an officer had a reasonable basis for believing that an individual "had committed or was committing an offense," *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), the *Terry* standard is whether an officer reasonably believed that "criminal activity may be afoot," *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The difference is critical: whereas probable cause looks for past or present illegalities, an underlying purpose of *Terry* is to grant officers the ability to prevent future wrongdoing.

 Consequently, the mere fact that particular conduct may be susceptible of an innocent explanation does not establish a lack of reasonable suspicion. *See Wardlow*, 528 U.S. at 125, 120 S.Ct. 673. The Supreme Court has consistently rejected the notion that courts can second-guess police officers by speculating on possible innocent reasons for a defendant's actions. *See, e.g., United States v. Arvizu*, 534 U.S. 266, 277–78, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). It has likewise prohibited courts from engaging in the sort of "divide-and-conquer analysis" that treats each action by a defendant in isolation, finds each of them to be possibly innocent, and thus picks apart an officer's reasonable assessments. *See, e.g., id.* at 274–75, 122 S.Ct. 744. Officers, in other words, are not required to rule out all possibility of innocent conduct or to wait until criminal activity actually occurs before responding to a suspicious set of circumstances. *Id.* at 277–78, 122 S.Ct. 744.

In *Terry* itself, Officer McFadden did not witness any illegal activity before stopping the men and patting them down. Their conduct—pacing back and forth and talking to each other outside of a store— was itself legal and perhaps susceptible of an innocent explanation, but it rightfully aroused Officer McFadden's suspicion that

they were casing the store for a hold up. *Terry*, 392 U.S. at 22–23, 30, 88 S.Ct. 1868. It was the observed legal activity that in McFadden's practiced judgment was inconsistent with innocent conduct which aroused his suspicion and justified his stop and frisk. *See Wardlow*, 528 U.S. at 125, 120 S.Ct. 673 (noting that in *Terry* the observed acts were each innocent, but, taken together in context, led to reasonable suspicion to investigate).

The situation here is no different. Mrs. Hayes' tip indicated that two men were pointing rifles in various directions in the front yard of a duplex well known for drug activity in a high crime and drug trafficking area. In West Virginia, it is not illegal to openly carry a firearm. W. Va.Code § 61–7–3 (2000). Our dissenting friend is surely correct that "people in West Virginia display their hunting and sporting rifles all the time," *post* at 328, and this is not only innocent activity but worthwhile activity as well. What West Virginians do not do all the time is point rifles around outside of a known drug house in the middle of a residential but high-crime and drug-ridden neighborhood. This type of activity, as the district court recognized, would give any officer a commonsensical reason to be suspicious. We emphatically do not, as the dissent suggests, endorse investigative stops whenever "police get an anonymous tip that a West Virginia resident has been displaying his rifle." *Post* at 328. We do hold, however, that the reported activity here was not innocuous and that it warranted police investigation.

In sum, the tip relayed, and the surrounding circumstances confirmed, dangerous and intimidating behavior that was inconsistent with innocent action. *See United States v. Lenoir*, 318 F.3d 725, 729–30 (7th Cir.2003) ("Carrying ... weapons may not be a crime in Indiana, but the police can still factor this otherwise

innocent behavior into the [reasonable suspicion] equation."). The reported conduct, while legal, rightfully aroused Officer Burdette's suspicion. He knew that it was a drug-ridden residential neighborhood, and that the duplex itself was a known drug house. He identified the passenger in the car as a known drug taker. Officer Burdette inferred from all the circumstances that the situation was a "drug deal gone bad," a conclusion that we credit. *See Arvizu,* 534 U.S. at 276–77, 122 S.Ct. 744; *United States v. Lender,* 985 F.2d 151, 154 (4th Cir.1993). An investigatory stop of the car was surely warranted in order to assess the dangers and to ensure the safety of the residents of this area. We cannot afford to read the Fourth Amendment to require officers to wait until criminal activity occurs, and perhaps until innocent bystanders are physically harmed, before taking reasonable, preventive measures.

## VI.

The judgment of the district court is therefore

*AFFIRMED.*

MICHAEL, Circuit Judge, dissenting:

People in West Virginia display their hunting and sporting rifles all the time. It is not against the law, as the majority acknowledges. *Ante* at 326. Yet under the majority's decision, if the police get an anonymous tip that a West Virginia resident has been displaying his rifle, the police may stop his car without any real confirmation of the likelihood of criminal activity. In this case, the dispatcher at the St. Albans, West Virginia, police department received an anonymous tip that two white men were in a yard at a certain address, displaying or pointing rifles. It was a high crime area, and an officer went to the scene to investigate. The officer saw no rifles, nor anything else illegal or suspicious. The officer spotted two white men leaving in a car described by the tipster and stopped the car. The anonymous tip, taken with what the officer saw, did not provide reasonable suspicion that criminal activity was afoot. As a result, the stop violated the Fourth Amendment's guarantee against unreasonable seizures. I must therefore respectfully dissent.

## I.

The dispatcher at the St. Albans police department received a tip from an unidentified caller on May 5, 2002, during the evening shift. The caller said that two white men were in the front yard of 2740 Knox Avenue with rifles, pointing them in various directions. A small red car with a silver or white stripe was also mentioned. The caller admittedly "didn't know what was going on." J.A. 34. The dispatcher radioed this information to Officer Mark Burdette, who was on duty in his cruiser. Officer Burdette did not know who the caller was, but he "suspected" the caller was a Mrs. Hayes, who lived across the street from 2740 Knox Avenue. The officer thought of Mrs. Hayes because she had called in six to ten complaints in the past, giving reliable information. Officer Burdette is familiar with Knox Avenue; it is a residential neighborhood with children, but it is also a high crime area, known for drug trafficking. Burdette had assisted the Metro Drug Unit with four or five investigations on Knox Avenue, and he had arrested two women who lived at 2738 Knox Avenue for possession of forged prescriptions and drug paraphernalia. The residences at no. 2738 and no. 2740 (the latter is the address mentioned by the tipster) are separate halves of a duplex. When the dispatcher relayed the caller's tip about men displaying rifles, Officer Burdette "figured that it was possibly a drug deal gone bad." J.A. 26–27.

Officer Burdette drove to Knox Avenue and stopped in front of no. 2738. As he arrived, he noticed two cars in front of him. One of the cars, a small red one with a silver or white stripe, was pulling away. Officer Burdette recognized the passenger as Mark Freeman, a drug user who lived in the next block of Knox Avenue. Burdette radioed a fellow officer who was arriving at the same time, and both officers participated in a stop of the red car. When Officer Burdette walked up to the car, he noticed a rifle in an open case in the back seat. The driver of the car, defendant John Perkins, admitted to the officers that he was a convicted felon. Perkins consented to a search, and two other guns and certain drug paraphernalia were discovered in the car. Perkins said he was trying to sell the guns for his wife.

Perkins was indicted for being a felon in possession of firearms. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2). Thereafter, he moved to suppress the evidence seized when his car was stopped, arguing that the stop violated the Fourth Amendment. The district court denied the motion. The court took into account Officer Burdette's knowledge that Knox Avenue was a high drug-crime area. Further, the court "did not deem the informant, Mrs. [Hayes], to be anonymous." J.A. 42. Officer Burdette, the court found, "reasonably assumed a complaint about illegal activity might come from Mrs. [Hayes]," and the officer "correctly believed it to be reliable." *Id.* In sum, the district court concluded that "the initial stop was based on reasonable suspicion from a credible informant." J.A. 43.

## II.

### A.

An officer may "conduct a brief, investigatory stop when [he] has a reasonable,

articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Reasonable suspicion may be supported by second-hand information, such as a tip. *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Nevertheless, reasonable suspicion depends both on the content (or quantity) and the reliability (or quality) of the information possessed by the officer. *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Both of these factors, content and reliability, "are considered in the totality of the circumstances—the whole picture, that must be taken into account when evaluating whether there is reasonable suspicion." *Id.* (quotation marks and citation omitted).

When suspicion of criminal activity begins with an anonymous tip, the tip must be assessed with extra caution because an anonymous tip by itself seldom demonstrates the tipster's reliability and basis of knowledge. *White*, 496 U.S. at 329, 110 S.Ct. 2412. The anonymous tipster simply does "not place[] his credibility at risk." *Florida v. J.L.*, 529 U.S. 266, 275, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (Kennedy, J., concurring). Of course, an anonymous tip may be corroborated through independent police work. *White*, 496 U.S. at 330, 110 S.Ct. 2412. When "a tip has a relatively low degree of reliability," as is often the case with an anonymous tip, "more information will be required to establish the requisite quantum of suspicion." *Id.* Specifically, when a *Terry* stop is based on an anonymous tip, the reasonable suspicion standard "requires that [the] tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272, 120 S.Ct. 1375. Thus, if an officer merely confirms that an anonymous tip accurately describes a sub-

ject's location and appearance, a *Terry* stop would be unreasonable because this minimal corroboration "does not show that the tipster has knowledge of . . . criminal activity." *Id.* In any case, the entire picture is the key in assessing whether the officer has reasonable suspicion of criminal activity when he makes a *Terry* stop. Here, when the reliability and content of Officer Burdette's information is assessed, it is clear that he did not have reasonable suspicion that criminal activity was afoot.

## B.

A key issue is whether the caller's tip was anonymous, making it inherently less reliable. The district court found that Mrs. Hayes was a known informant because Officer Burdette reasonably assumed she was the caller. The majority also concludes that Officer Burdette reasonably assumed the tipster was Mrs. Hayes. Any finding or conclusion that Mrs. Hayes was a known tipster or informant in this instance is clearly erroneous. *See United States v. Rusher,* 966 F.2d 868, 873 (4th Cir.1992) (district court's factual findings in a suppression proceeding are reviewed under the clearly erroneous standard).

First, if the caller was Mrs. Hayes, anonymity would not be expected. According to Officer Burdette, Mrs. Hayes was "normally" the person who called the St. Albans police with complaints from Knox Avenue. She had called in six to ten prior complaints, and Officer Burdette knew that she had been the caller on those occasions. It thus appears that it was Mrs. Hayes's practice to identify herself. The caller in this case did not give her name, choosing not to place her credibility on the line. Second, the activity reported by the caller was occurring in the open, in a small front yard at 2740 Knox Avenue, a residential neighborhood. Mrs. Hayes

lived across the street, but she was by no means the only person with a view of the front yard at no. 2740, where two men were reportedly displaying rifles. What the caller described could have been seen from inside or outside several nearby houses, so the call could have come from anyone who was in the vicinity. In sum, the evidence is too inconclusive to permit a finding that Mrs. Hayes was the *actual* caller or that Officer Burdette reasonably assumed she was the caller. The caller was anonymous, and this means that the tip begins with a relatively low degree of reliability.

At one point the majority suggests, for the sake of argument, that it is willing to treat the tip as anonymous. Yet when the majority concludes that Officer Burdette had enough information to confirm the tip's reliability, the majority relies on its (unwarranted) conclusion that "[t]he caller was not entirely unknown, as Officer Burdette reasonably assumed that it was Mrs. Hayes." *Ante* at 323–24. If a tip is truly anonymous, as the tip here is, an officer's ill-founded assumption that the tipster is a known informant cannot be weighed in favor of reliability.

The tip in this case suffers from a defect more fundamental than its anonymity. It is deficient in substance or content. Again, when the reasonable suspicion for a *Terry* stop is grounded in an anonymous tip, the "tip [must] be reliable in its assertion of illegality" or in its indication "as to the likelihood of criminal activity." *J.L.,* 529 U.S. at 272, 120 S.Ct. 1375. The tip here was that two men were in a particular front yard with rifles, pointing them in various directions. This was not an assertion of illegal conduct because it is not against the law in West Virginia to display or sight a rifle. Nor did the tip give any indication of the likelihood of criminal activity. The tipster, who the majority con-

cludes was "in close proximity to the duplex" and had "personally . . . observed the men," *ante* at 322, did not say what, if anything, the men were pointing the rifles toward. The tipster did not report that the men were threatening anyone or engaging in any violence. She did not say she had observed any transaction, let alone one that appeared to have gone awry. In fact, she admitted that she "didn't know what was going on at the time." J.A. 34. Because of the tip's weaknesses, specifically, its anonymity and its failure to indicate the likelihood of illegal conduct, more concrete information was "required to establish the requisite quantum of suspicion." *White,* 496 U.S. at 330, 110 S.Ct. 2412.

The majority argues that Officer Burdette was able to "confirm[ ] the tip's reliability with his own knowledge of the area and with his own observations upon arriving at the scene." *Ante* at 324. I respectfully disagree. I discuss first Officer Burdette's knowledge of the area. The officer knew there was drug trafficking on Knox Avenue: he had assisted the Metro Drug Unit in several investigations there, and he had arrested two women who lived at no. 2738, a "drug house" that was still being watched by the special unit. With this information and the tip that two men with rifles were in a yard next door to no. 2738, Officer Burdette "figured that it was possibly a drug deal gone bad." J.A. 26–27. A fouled up drug deal was a *possibility,* I suppose, but a rifle would be an unusual weapon for a drug trafficker to take to a deal in the close confines of a city. Moreover, it appears that Officer Burdette did not seriously consider the tip to be a complaint about drug dealing. When Officer Burdette "got a drug complaint . . . anywhere on Knox Avenue," his usual practice was to contact a fellow officer assigned to the Metro Drug Unit. J.A. 25. This practice allowed the officer with the drug unit to determine the appropriate response,

and it prevented ongoing drug investigations from being "mess[ed] up." J.A. 25–26. Officer Burdette did not contact the drug unit in this instance.

In any event, if we treated a neighborhood's high rate of drug crime as an independent factor that bolstered the reliability of a tip, "we would be, in effect, holding a suspect accountable for factors wholly outside of his control." *United States v. Perrin,* 45 F.3d 869, 873 (4th Cir.1995). The fact that a suspect is spotted "in a high crime area does not, in and of itself, provide [an] officer[ ] with sufficient indicia of reliability to justify a *Terry* [stop]." *Id.* Along this line, it should be noted that the men reportedly spotted were not in the yard at the drug house; rather, they were in the yard next door, at 2740 Knox Avenue. There is no evidence that anyone at no. 2740 was involved with drugs. I recognize, of course, that Knox Avenue's reputation as an area of high crime and drug trafficking is relevant to explain why Officer Burdette believed it was necessary to go to the scene and investigate. However, the status of the neighborhood does not bolster the reliability of the anonymous tip and adds little, if any-thing, to the measure of reasonable suspicion.

Finally, there is what Officer Burdette observed. When the officer arrived at the scene, he saw two white men in a red car with a silver or white stripe departing from 2740 Knox Avenue. The tip was therefore reliable in its description of the two men and their vehicle. However, reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.,* 529 U.S. at 272, 120 S.Ct. 1375. Officer Burdette did not see any illegal or suspicious activity as he arrived, nor did he see any firearms. Although the red car was pulling out as the officer drove up, there is no evidence that

the occupants of the red car saw the officer arriving, and there is no evidence that their departure was in any way suspicious.

As the red car left no. 2740, Officer Burdette noticed that the passenger was Mark Freeman, a known drug taker, who lived in the very next block. Perhaps Freeman had a criminal record. But a prior "record is not, standing alone, sufficient to create reasonable suspicion." *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir.1997) (internal quotation marks omitted). "Nevertheless, an officer can couple knowledge of prior criminal involvement with more concrete factors in reaching a reasonable suspicion of current criminal activity." *Id.* There were no concrete indications that Freeman was involved in criminal activity on the day in question. Freeman's presence in his own neighborhood was not a suspicious event. Moreover, there was no evidence that he was known to be armed or dangerous, factors that might have corroborated the tip's report of rifle possession.

When the whole picture is assessed, the tip is still not infused with sufficient reliability. The tip did not suggest illegal activity. Officer Burdette did confirm that the tip was accurate in describing the location of the men (2740 Knox Avenue), their appearance (white), and their car (small and red). This information, however, did not confirm that the tipster had information about the likelihood of criminal activity. Officer Burdette saw nothing illegal or suspicious when he arrived at the scene. Finally, the thinness of the tip is not redeemed in this case by the character of the neighborhood or by the fact that one of the men was a drug user. Because Officer Burdette lacked reasonable suspicion, his stop of Perkins's car violated the Fourth Amendment's protection against unreasonable seizures. The incriminating evidence found in the car should have been suppressed, and the district court's order should be reversed.

## C.

The majority responds to my dissent by conceding that displaying a hunting or sporting rifle in West Virginia is an "innocent" and "worthwhile activity." *Ante* at 327. The majority adds that it "emphatically do[es] not ... endorse investigative stops whenever police get an anonymous tip that a West Virginia resident has been displaying his rifle." *Id.* (internal quotation marks and citation omitted). However, because of what the majority actually holds, these statements are of no comfort to the rifle owning West Virginian who happens to live in a high-crime or drug-ridden neighborhood. When an anonymous caller tells the police—without making any suggestion of illegality—that a person in a high-crime area has been displaying or pointing his rifle, the majority subjects him to a car stop, even though the police see nothing suspicious when they arrive at the scene. Thus, under the majority's analysis, the bad reputation of the neighborhood (and here, a house next door) carries far too much of the weight in justifying reasonable suspicion. As a result, today's decision exposes too many innocent people in rough neighborhoods to unreasonable stops by the police.