**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 09-4734**

───────────

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

CLIFTON THOMAS TALLEY,

        Defendant - Appellant.

───────────

**No. 09-4873**

───────────

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

CLIFTON THOMAS TALLEY,

        Defendant - Appellant.

───────────

Appeals from the United States District Court for the Western
District of Virginia, at Harrisonburg.   Samuel G. Wilson,
District Judge. (5:08-cr-00030-sgw-1; 5:09-cr-00024-sgw-1)

───────────

Submitted:  July 20, 2010          Decided:  August 9, 2010

───────────

Before TRAXLER, Chief Judge, DUNCAN, Circuit Judge, and
HAMILTON, Senior Circuit Judge.

───────────

Affirmed by unpublished per curiam opinion.

———————————

Larry W. Shelton, Federal Public Defender, Roanoke, Virginia, Andrea L. Harris, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlottesville, Virginia, for Appellant. Timothy J. Heaphy, United States Attorney, Roanoke, Virginia, Nancy S. Healey, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Clifton Thomas Talley appeals the denial of his motion to suppress evidence obtained as a result of what he claims was an illegal seizure of his person. He also appeals the revocation of a term of supervised release imposed in a prior case as well as the sentence he received as the result of the revocation. Finding no error, we affirm.

I.

On the afternoon of July 5, 2008, a woman speaking in broken English called 911 to report that a man was viewing child pornography on a computer in the Staunton Public Library. Staunton Police Officers Robert Hildebrand and Ray Murray, both dressed in their police uniforms, responded to the call within 17 minutes. The 911 dispatcher informed the officers that the suspect was described as a white male, 40 to 50 years old, with brown hair, shorts, and slip-on shoes and that he was in the library's computer area, straight back from the front door. The dispatcher had a call-back number for the 911 caller although the caller had not provided her name.

Upon their arrival at the library, the officers did not find anyone matching the description in the library's actual computer room. Hildebrand therefore asked the dispatcher to have the 911 caller meet them somewhere in the library. The

3

officers then proceeded to another area of the library that was also straight back from the main entrance. There, they were able to find a person, later identified as Clifton Talley, fitting the caller's description. Talley, a white male, looked to the officers to be "around 50," and he was wearing shorts and flip-flops and using a laptop computer. J.A. 146. Hildebrand made eye contact with Talley three times and testified that Talley seemed to be "logging off the laptop, nervously." J.A. 90-91. As the officers walked past Talley, it appeared to them that there were no applications running on his computer.

When the officers went to speak with a library employee, Talley got up and left the library. Hildebrand followed him, approached Talley, and told him that he matched a description of a suspect who had been identified as looking at child pornography. Hildebrand asked Talley if he had been looking at child pornography, and Talley denied doing so. Hildebrand asked for consent to look at Talley's laptop, but Talley refused. Talley did, however, provide his driver's license when asked by Hildebrand for identification. For safety purposes, Hildebrand also took a backpack that Talley was carrying. Hildebrand then returned to his patrol car to run Talley's license, leaving Talley's backpack on the hood of the car. Officer Murray, who had also exited the library, remained with Talley.

4

When he processed the license, Hildebrand learned that Talley had prior child pornography convictions, was registered as a sexually violent predator, and was on probation. Hildebrand testified that when he returned to Talley and asked him if he was on probation, Talley became "very nervous." J.A. 94. Around the same time, the 911 dispatcher told Hildebrand that the 911 caller was "going to be by the entrance" and that "[s]he stated she believes you have the wrong person." J.A. 236. Approximately 30 seconds later, as Hildebrand continued to question Talley, Talley told Hildebrand, "I am sick." J.A. 95 (internal quotation marks omitted). When Hildebrand asked whether he was physically sick or mentally sick, Talley responded, "I can't stop looking at porn." J.A. 95 (internal quotation marks omitted). He nevertheless asked Hildebrand to "give him a break and let him go." J.A. 95. Hildebrand arrested Talley instead.

Officer Murray had not heard the dispatcher's statement that the caller believed they had the wrong person. However, he had heard that the caller was at the library's entrance, and he therefore had gone to find her. When he found her, she described in broken English the images that prompted her 911 call. She said that she saw a nude girl, "approximately 10 years of age or so" with what looked like paper covering her eyes and face. J.A. 150. She made no mention of believing that

5

the officers had the wrong person. After Talley's arrest, Murray again spoke in person with the caller and obtained her personal information. She also described the area in which she had seen the images that prompted her call, and it was the same area in which the officers had first seen Talley.

After Talley was placed under arrest, Murray searched his backpack and found a notebook containing a list of suggestive web addresses, like "youngboys.com." J.A. 154. Hildebrand had looked through the backpack for officer safety and observed that there was a laptop computer and perhaps a notebook. Hildebrand advised Talley of his Miranda rights and transported him to the Staunton Police Department. Talley subsequently waived his Miranda rights and admitted to having images of naked minors on his computer and accessing websites depicting naked minors. Murray later obtained a search warrant for Talley's laptop computer, the execution of which revealed several images that appeared to be child pornography. Arrest warrants were thereafter obtained for Talley for possession of child pornography, and a second search warrant was obtained for Talley's home. The execution of the search warrant yielded a disk containing child pornography.

A Charlottesville federal grand jury subsequently returned an indictment against Talley charging him with two counts of knowingly possessing material containing images of child

6

pornography.  See 18 U.S.C. § 2252A(a)(5)(B) and 2252(b)(2).

Talley moved to suppress the evidence as fruit of his initial detention and arrest, both of which he claimed were unconstitutional.  Following a hearing, the district court denied the motion.  The court ruled that Officer Hildebrand reasonably suspected Talley of possession of child pornography when he initially detained him and that the reasonable suspicion was not dissipated by the dispatcher's statement that the caller believed they had the wrong man.  The court further found that probable cause existed to arrest Talley when, in the context of Hildebrand's investigation of the child pornography crime, Talley asked Officer Hildebrand to "give him a break and let him go" because he could not stop himself from looking at pornography.  The court found that it would have been reasonable for Hildebrand to conclude that Talley had admitted to committing the crime he was investigating.

Talley entered a conditional plea to the charges, reserving the right to appeal the denial of his suppression motion.  At the sentencing hearing, the government argued for an upward variance or departure primarily based on Talley's prior criminal history, his pattern of recidivism, and the nature of his offenses.  The government emphasized that he had been on supervised release for a prior federal child pornography crime when he committed the present offenses and that he had committed

the prior crime when on supervised release for an earlier child pornography offense. Talley argued for a sentence at the enhanced statutory minimum of 10 years. In the end, the district court varied upward based on the 18 U.S.C. § 3553(a) factors, including Talley's offense history and recidivism, and the need for the sentence to afford adequate deterrence, sentencing Talley to 160 months' imprisonment on each count, to be served concurrently, as well as lifetime supervision.

A federal probation officer assigned to supervise Talley petitioned to revoke Talley's supervised release, contending that he had violated three conditions of his supervision, including the condition that he would not commit further crimes. At the revocation proceeding the district court found that Talley's crimes did in fact constitute a Grade B supervised release violation. See U.S.S.G. § 7B1.1(a)(2). Because Talley had a Category II criminal history, he faced a statutory maximum custody range of up to three years, and his advisory revocation sentencing range was six to twelve months. The government requested that the district court consider sentencing Talley up to a consecutive maximum of three years' imprisonment based on the arguments the government had presented at the sentencing proceeding for the crimes underlying the revocation. Talley argued for a concurrent sentence within the advisory range. Concluding that that Talley had shown himself to be "very

8

difficult to supervise," the district court found the advisory range inappropriate and imposed a 30-month consecutive term. J.A. 422.

## II.

On appeal, Talley first argues that the officers never had a sufficient basis to detain him and, alternatively, that any reasonable suspicion they had immediately dissipated when they were told the 911 caller had stated that she believed they had the wrong person. Talley argues that all of his statements made after that point should be suppressed as fruit of the illegal seizure of his person. He also contends that the officers lacked probable cause to arrest him at the time they took him into custody and argues for the suppression of the fruit of that seizure. Finally, he maintains that because his convictions were obtained as the result of these illegal seizures of his person, the district court also erred in utilizing them as the basis for revoking his term of supervised release. We disagree with all of these arguments, however, and hold that the district court correctly ruled that Talley's constitutional rights were not infringed.

We conclude that, under the totality of the circumstances, the officers were legally justified in detaining Talley prior to arresting him and that probable cause supported Talley's arrest.

Under Terry v. Ohio, 392 U.S. 1 (1968), "an officer may conduct a brief investigatory stop where the officer has reasonable suspicion that criminal activity may be afoot." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004). Such a stop requires only "a minimal level of objective justification," and it need not rise to the level of probable cause. Illinois v. Wardlow, 528 U.S. 119, 123 (2000). "In cases where an informant's tip supplies part of the basis for reasonable suspicion, we must ensure the tip possesses sufficient indicia of reliability." Perkins, 363 F.3d at 323.

In this case, several factors supported the reliability of the information the caller provided. First, although the 911 caller did not initially provide her name, the dispatcher had a phone number at which the officers could contact her. See United States v. Reaves, 512 F.3d 123, 127 (4th Cir. 2008) ("When an unidentified tipster provides enough information to allow the police to readily trace her identity, thereby subjecting herself to potential scrutiny and responsibility for the allegations, a reasonable officer may conclude that the tipster is credible."). Second, her description of the suspect and his location in the library, along with the nature of the conduct reported strongly suggested that she had observed that conduct first-hand. See Perkins, 363 F.3d at 325 ("The caller in this case was clearly in a position to know about the

10

reported activity that gave rise to [the officer's] suspicion."). Third, when the officers found a man generally fitting the caller's description, he appeared to act evasively. See United States v. Sims, 296 F.3d 284, 287 (4th Cir. 2002) (holding that suspect's evasive behavior sufficiently supported reliability of tip to authorize Terry stop). When seeing the police, he appeared to nervously sign off his computer and promptly exit the library. Thus, by the time Hildebrand first spoke with Talley, he was already authorized to conduct a Terry stop.[*]

Once Hildebrand obtained Talley's license and processed it, he learned of Talley's prior child pornography convictions. And, the nervousness Talley exhibited during questioning gave him further basis to suspect that Talley was the person the caller had described. Talley nevertheless suggests that the dispatcher's statement that the caller believed they had the wrong person negated any reasonable suspicion that the officers had. We disagree. Talley not only generally fit the caller's description, he was the only person the officers found who did.

---

[*] Talley argues that it is possible that what the caller believed to be "child pornography" actually did not satisfy the legal definition of that term. While Talley is correct that the caller could have made such a mistake, that possibility did not prevent the officers from at least reasonably suspecting that Talley was engaging in criminal activity, particularly considering his furtive behavior.

11

Based on this fact, Talley's furtive behavior, and Talley's prior child pornography crimes, the officers had reason to believe either that the caller was mistaken about them having the wrong man or that the dispatcher had misunderstood her broken English in reporting that statement. Thus, Hildebrand was at least authorized to briefly continue his questioning of Talley, which at that point, had lasted no more than two minutes.

Within 30 seconds of the dispatcher telling the officers that the caller believed they had the wrong person, Talley had admitted to Hildebrand that he could not stop looking at pornography and asked Hildebrand to give him a break and let him go. In the context of Hildebrand's questioning regarding the possible child pornography offense, Hildebrand had reason to believe that Talley had just admitted his guilt. He therefore had probable cause to arrest him. See Devenpeck v. Alford, 543 U.S. 146, 152 (2004) ("[W]arrantless arrest . . . is reasonable . . . where there is probable cause to believe that a criminal offense has been or is being committed.").


                              III.

Talley also maintains that his 30-month sentence upon revocation of his supervised release term was plainly unreasonable. We disagree.

                              12

A court imposing a revocation sentence "ultimately has broad discretion to . . . impose a term of imprisonment up to the statutory maximum." United States v. Crudup, 461 F.3d 433, 439 (4th Cir. 2006) (internal quotation marks omitted). Recommended sentencing ranges for violations of supervised release are not true guidelines but rather "'policy statements only' to give courts 'greater flexibility' in devising revocation sentences." Id. at 435 (quoting U.S.S.G., Ch. 7, pt. A, introductory cmts. 1, 3(a)).

Talley argues that in imposing the 30-month sentence, the district court "failed to give weight to Talley's age (59), poor health (cardiac and gastric chronic conditions), and the high, over-guideline sentence he had already received for the same conduct." Brief of Appellant at 26. Talley also notes that "[t]he record does not reflect any consideration of 3553(a) factors other than Talley's recidivism and the need to 'protect the public.'" Id. We conclude, however, that the sentence imposed was not even unreasonable, let alone plainly unreasonable.

In imposing the 30-month sentence, the district court stated that it had concluded that the revocation guideline range was not an appropriate range under the specific circumstances of this case because Talley had proven himself to be "very difficult to supervise." J.A. 421. Given that the crimes

13

underlying the sentence Talley challenges marked the second time Talley had committed such crimes during a term of supervised release, the district court's assessment was certainly correct. We conclude the sentence imposed, which was six months below the maximum allowed by statute, was a reasonable one. Cf. Crudup, 461 F.3d at 440 (holding that 36-month revocation sentence was reasonable when defendant had repeatedly violated conditions of supervised release). The explanation of the sentence was also sufficient. See id. at 439 (holding that "a court's statement of its reasons for going beyond non-binding policy statements in imposing a sentence after revoking a defendant's supervised release term need not be as specific as has been required when courts departed from guidelines that were, before Booker, considered to be mandatory" (internal quotation marks omitted)).

IV.

For the foregoing reasons, we affirm Talley's convictions and revocation sentence.

AFFIRMED

14