PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

v.                                              No. 03-4529

IRVIN D. MAYO,
            *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CR-03-99)

Argued: January 23, 2004

Decided: March 23, 2004

Before NIEMEYER, SHEDD, and DUNCAN, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Niemeyer wrote
the opinion, in which Judge Shedd and Judge Duncan joined.

---

## COUNSEL

**ARGUED:** Michael James Elston, Assistant United States Attorney,
Alexandria, Virginia, for Appellant. Mary Elizabeth Maguire, Assistant Federal Public Defender, Richmond, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellant. Frank W. Dunham, Jr., Federal Public Defender,
Richmond, Virginia, for Appellee.

**OPINION**

NIEMEYER, Circuit Judge:

City of Richmond police officers stopped and frisked Irvin Mayo while he was walking in a high-crime area of Richmond, Virginia. The officers had observed Mayo react to their presence by placing his hand in his left pocket and thereafter conduct himself in an evasive and suspicious manner, manifesting culpability to the officers. On stopping and frisking Mayo — under the authority of *Terry v. Ohio*, 392 U.S. 1 (1968) — the officers recovered a handgun, leading to Mayo's indictment for possession of a firearm in furtherance of drug trafficking and other related charges. The district court, concluding that the circumstances were covered by our decision in *United States v. Burton*, 228 F.3d 524 (4th Cir. 2000), felt compelled to grant Mayo's motion to suppress the evidence seized following the officer's stop and frisk.

Because *Burton* presented distinguishing facts — the officers in *Burton* conceded that they had "no indication that [the defendant] was at the time engaging in any illegal activity," whereas the officers in this case asserted that they had a reasonable suspicion supported by articulable facts that Mayo was possessing a concealed weapon — we conclude that this case is not controlled by *Burton*. On review of the facts found in this case, we conclude that the officers had authority to stop and frisk Mayo, and, therefore, we reverse and remand this case for further proceedings.

I

During the afternoon of February 14, 2003, City of Richmond Police Officers Kenneth Cornett and C.G. Johnson were driving in a marked patrol car through a "high-crime" neighborhood on the south side of Richmond. This neighborhood had recently been designated as a target area for the police department's "Wave Initiative," which was designed to respond to community problems and citizen complaints stemming from drug dealing. In addition, Officer Cornett knew the area to be a high-crime area. In the weeks preceding February 14, two shootings had occurred in the neighborhood, and Cornett

himself had recovered firearms and drugs in connection with three separate incidents.

While traveling through the neighborhood on February 14, Officers Cornett and Johnson observed Mayo standing in the middle of the street, talking to another person who was on the side of the street. When Mayo observed the approaching police car, he reactively "put his left hand into his left hand jacket pocket, turned 180 degrees, walked out of the street and onto the [apartment] complex property that is posted no trespassing and through that property between two buildings." Officer Cornett observed that Mayo "either . . . had something heavy in [his] pocket or he was pushing his hand down" into the pocket, a movement that Officer Cornett believed was consistent with an individual's effort to maintain control of a weapon while moving. The officers drove around the corner and waited to see if Mayo would emerge from the other side of the apartment complex. When Mayo did emerge and observe the officers again, he "immediately stopped, just froze in his tracks for a split second, then started walking along the side of the building."

At this point, Officer Cornett exited the patrol car and approached Mayo with his badge displayed. As Officer Cornett asked Mayo if he could speak with him, Officer Johnson requested that Mayo remove his left hand from his pocket, which Mayo did. When Officer Cornett asked Mayo whether he lived in the apartment complex, Mayo gave no answer but reacted in a peculiar manner. Officer Cornett observed that Mayo's "eyes were extremely wide, his mouth was slightly agape, and it was almost like nothing registered with him. It was almost as if he was in shock." The officer also observed that Mayo's shirt was "fluttering . . . as though he was shaking." Officer Cornett asked Mayo if he had a weapon, at which point Mayo averted his eyes, looking downward, and said nothing. This reaction made Officer Cornett "nervous," prompting him to inform Mayo that he was going to pat Mayo down "for my safety." Mayo responded to this statement by raising his hands halfway up. When Officer Cornett frisked Mayo, he found a semiautomatic pistol in his left jacket pocket, the pocket into which Mayo had earlier inserted his hand when the officers first approached him in the patrol car.

The officers seized the pistol, arrested Mayo for carrying a concealed weapon without a permit, handcuffed him, and read him his

*Miranda* rights, to which Mayo responded with a nod of acknowledgment. In response to Officer Cornett's questions whether Mayo had any drugs on him, Mayo again averted his eyes and said nothing. The officers then conducted a search incident to arrest, during which they recovered several rocks of crack cocaine and marijuana.

Mayo was indicted on three counts for drug violations and one count for possession of a firearm in furtherance of drug trafficking. Before trial, Mayo moved to suppress the evidence seized by Officer Cornett, contending that the stop by the officers violated his Fourth Amendment rights and was not justified by "a reasonable suspicion supported by articulable facts" as required by *Terry v. Ohio*, 392 U.S. 1 (1968). The district court considered Officer Cornett's stop-and-frisk in light of our ruling in *United States v. Burton*, 228 F.3d 524 (4th Cir. 2000) (concluding that police officers in circumstances presented there did not have a reasonable suspicion to frisk the defendant), and determined that Officer Cornett's search of Mayo fell "squarely within the holding of *Burton*." The court reached this conclusion notwithstanding its observation that "there is evidence that the defendant was carrying — that in the view of the officer, the defendant was acting in such a way as to — that was consistent with somebody who was carrying a weapon."

From the district court's order suppressing the evidence as the fruit of an improper stop under *Terry v. Ohio*, 392 U.S. 1 (1968), the government prosecuted this appeal.

II

The government contends that Officer Cornett had a reasonable suspicion supported by articulable facts to believe that criminal activity may have been afoot; Mayo may have been carrying a concealed weapon without a permit, in violation of Virginia Code § 18.2-308. It argues that Officer Cornett's suspicion was "based on the defendant's furtive and evasive conduct in a high-crime area, the way he was holding his left hand in his jacket pocket, his physical response to the confrontation with police officers, and his response to questions regarding where he lived and whether he was carrying any weapons." The government argues that the district court erred in concluding that

the circumstances here are controlled by *United States v. Burton*, 228 F.3d 524 (4th Cir. 2000), because that case is distinguishable.

Mayo contends that not only are the circumstances here covered by *Burton*, the circumstances here are "more favorable" to Mayo in that "Mayo complied with the officer's request that he remove his hand from his jacket" — a fact that Mayo argues gives an indication that the officer no longer "had any further reason to believe that [Mayo] had a weapon."

In granting Mayo's motion to suppress, the district court credited Officer Cornett's version of the facts but concluded that they fell under the holding of *Burton*:

> I find that the totality of the circumstances here puts this case squarely within the holding of *Burton*, notwithstanding that there is evidence that the defendant was carrying — that in the view of the officer, the defendant was acting in such a way as to — that was consistent with somebody who was carrying a weapon.

Although ultimately concluding that the officers did not have a reasonable articulable suspicion that Mayo "was engaged in criminal activity," in reaching this conclusion, the court appears to have focused on whether the Richmond police officers had a legitimate safety concern. Viewing *Burton* as a ruling focusing on the safety concern, the district court noted that in *Burton* the defendant refused to remove his hand when asked to. The court paraphrased the dissenting opinion in *Burton*, stating, "And Burton's nonresponse to the request that he remove his hand from the coat constituted, crediting the practical experience of the officers, an entirely reasonable safety concern." *See Burton*, 228 F.3d at 530 (King, J., dissenting). The district court apparently reasoned, because we held in *Burton* that the officers were not justified in frisking the defendant, *a priori*, this case fell well within *Burton* because Mayo indeed did remove his hand, presenting less of a risk to the officers. Therefore, the circumstances in this case fell within the district court's understanding of the holding of *Burton*, and it accordingly granted Mayo's motion to suppress.

The principles to be applied to this case are now well fixed. Although the Fourth Amendment prohibits unreasonable seizures of

persons, a police officer may temporarily stop a citizen "where [the] police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry*, 392 U.S. at 30. Moreover, in connection with such a stop, if the officer believes that the person being stopped "may be armed and presently dangerous," the officer may frisk the person by patting his outer clothing "in an attempt to discover weapons which might be used to assault [the officer]." *Id.*; *see also Adams v. Williams*, 407 U.S. 143, 146 (1972).

In reviewing the legality of *Terry* stops, we consider the "'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). And relevant to the totality of circumstances are various individual factors traditionally relied upon by police officers, such as whether the stop occurred in a high-crime area, *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing *Adams*, 407 U.S. at 144, 147-48), or whether the suspect engaged in evasive behavior or acted nervously, *see id.* (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) (*per curiam*); *United States v. Sokolow*, 490 U.S. 1, 8-9 (1989); *see also United States v. McFarley*, 991 F.2d 1188, 1192 (4th Cir. 1993) (identifying as "unusually nervous" such behavior as shaking hands, heavy breathing, and providing inconsistent answers). A suspect's refusal to cooperate with police, without more, does not satisfy *Terry* stop requirements. *See Wardlow*, 528 U.S. at 125 (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1999)). At bottom, the basis for a *Terry* stop is that the officer have a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Sokolow*, 490 U.S. at 7.

We applied this jurisprudence in *Burton* to conclude that police officers there did *not* have a reasonable suspicion supported by articulable facts that criminal activity was afoot. Accordingly, we concluded that a frisk of the suspect, conducted to allay the officers' safety fears, was not justified. The essence of our holding in *Burton* was that "an officer may not conduct this protective search for pur-

poses of safety *until he has a reasonable suspicion that supports the investigatory stop*." 228 F.3d at 528 (emphasis added).

In *Burton*, a group of police officers were walking through a neighborhood to serve outstanding warrants. When they approached Burton, who was standing at a pay phone with his right hand in his coat pocket, they identified themselves as police officers and requested identification from him. Burton did not respond to questions, nor did he move. He remained standing just as the officers found him. When one officer asked Burton to remove his hand from his coat pocket, Burton again remained unresponsive and did not move. One of the officers then reached into Burton's pocket and discovered a firearm. To justify this action, the officers explained that Burton's refusal to remove his hand from his coat made the officers feel "uneasy about our safety being there with him with his hand and no response, you know, towards us." 228 F.3d at 526. While the officers might have appropriately been concerned for their safety, seeing a citizen stand strangely mute without responding to their questions and having his hand in his coat pocket, the officers readily conceded that they were unaware of any outstanding warrants against Burton and that Burton "exhibited no evasive or suspicious behavior and [that] there was no indication that he was at the time engaging in any illegal activity." *Id.* at 527. Thus in *Burton*, the officers conceded that they did not have any suspicion that criminal activity was afoot, even though they did fear for their safety while talking to Burton. We held that an officer may not conduct a protective search to allay a reasonable fear that a suspect is armed without first having a reasonable suspicion that supports an investigatory stop. Quoting from *Terry* we said:

> [P]olicemen have no more right to "pat down" the outer clothing of passers-by or persons to whom they address casual questions, than does any other citizen. . . . [I]f the frisk is justified in order to protect the officer during an encounter with a citizen, *the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop. . . .* [T]he person addressed . . . *certainly need not submit to a frisk for the questioner's protection.*

*Id.*, at 528 (emphasis in the original) (quoting *Terry*, 392 U.S. at 32-33 (Harlan, J., concurring)); *see also Adams*, 407 U.S. at 146 ("*So*

*long as the officer is entitled to make a forcible stop*, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose" (emphasis added)).

Thus, *Burton* must be understood to authorize a protective frisk only when a *Terry* stop is authorized by a reasonable suspicion that criminal activity is afoot. To conduct the protective frisk there must also be reasonable grounds to believe that the suspect is armed and dangerous. Absent a reasonable suspicion of criminal activity, a police officer may not simply approach a citizen, as part of a police-citizen encounter, and frisk the citizen because the officer believes that his safety is at risk.

In this case, when the district court focused on the officer's safety, and not on whether the officers had a reasonable suspicion to believe that criminal activity was afoot, the court misunderstood the holding of *Burton*. Surely if officers' safety were an appropriate justification for Mayo's stop, then the district court might have been correct in observing that the officers here had less concern for safety than did the officers in *Burton* because in this case Mayo removed his hand from his pocket. But the fact that Mayo removed his hand from his pocket did not reduce the level of suspicion that the officers had *that Mayo was violating the law by carrying a concealed weapon without a permit*. Had the court considered whether criminal activity was properly suspected, its own conclusion would have resulted in a different ruling. As the district court observed, in this case "there is evidence that the defendant was carrying — that in the view of the officer, the defendant was acting in such a way as to — that was consistent with somebody who was carrying a weapon." In *Burton* there concededly was no such evidence. *See Burton*, 228 F.3d at 527. Accordingly, we conclude that the district court erred in applying *Burton* to grant the motion to suppress in this case.

When we evaluate the circumstances found in this case to determine whether the Richmond police officers had a reasonable suspicion to stop Mayo under the principles of *Terry v. Ohio*, we conclude that they did.

First, we note that Officer Cornett's encounter with Mayo occurred in a high-crime area that had been targeted for special enforcement by

the City of Richmond. Although standing alone this factor may not be the basis for reasonable suspicion to stop anyone in the area, *see Brown v. Texas*, 443 U.S. 47, 52 (1979), it is a factor that may be considered along with others to determine whether police have a reasonable suspicion based on the totality of the circumstances, *see Wardlow*, 528 U.S. at 124.

Second, Mayo's activity upon viewing the marked patrol car suggested that he might be carrying a gun. The way Mayo put his hand in his pocket and the appearance of something heavy in his pocket suggested to the officers that Mayo had put his left hand onto a gun to protect it while he was moving.

Third, upon seeing the police, Mayo sought to evade their scrutiny. When he saw the approaching police car, Mayo "turned 180 degrees" and walked from the street into an adjacent apartment complex. And when he came out the other side, only to view the police again, he reacted in a shocked manner, thereafter proceeding to walk away.

Fourth and finally, when the officers confronted Mayo, he evinced an unusually nervous behavior. He averted his eyes to avoid those of the officers, and his nervousness was palpable.

Confronted with the totality of these circumstances, the officers told Mayo that for their own safety they wished to pat him down, and Mayo raised his hands halfway while the frisk was conducted. The frisk itself amounted to a patting of Mayo's outside clothing, which revealed the gun. At that point, the officers had probable cause to arrest Mayo and to search him incident to an arrest, leading to the discovery of drugs.

In summary, the undisputed evidence, considered in its totality, indicates that Mayo reacted to the presence of police in a manner that indicated to trained police officers that he might be carrying a gun in his left pocket, in violation of Virginia Code § 18.2-308 (making it unlawful to carry a concealed weapon without a permit). Because the officers' suspicion was reasonable and was supported by articulable facts, the officers had a right to stop Mayo and, because they reasonably believed Mayo was armed, to pat him down in the interest of

their personal safety. *See Adams*, 407 U.S. at 146. As we made clear in *Burton*:

> Once an officer has a basis to make a lawful investigatory stop, he may protect himself during that stop by conducting a search for weapons if he "has reason to believe that the suspect is armed and dangerous."

228 F.3d at 528 (quoting *Adams*, 407 U.S. at 146). The legal pat down by Officer Cornett yielded a weapon, leading to Mayo's arrest and a legal search incident to that arrest.

Accordingly, we reverse the district court's order granting the motion to suppress and remand this case for further proceedings.

*REVERSED AND REMANDED*