UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.                                        No. 03-4637

JIMMIE J. PITTMAN,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CR-03-24)

Argued: May 5, 2004

Decided: June 29, 2004

Before WILKINSON and WILLIAMS, Circuit Judges, and
Bobby R. BALDOCK, Senior Circuit Judge of the
United States Court of Appeals for the Tenth Circuit,
sitting by designation.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Robert James Wagner, Assistant Federal Public
Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Rich-
mond, Virginia, for Appellant. Shannon Leigh Taylor, RICHMOND
METROPOLITAN MULTIJURISDICTIONAL GRAND JURY, City
of Richmond and Counties of Chesterfield, Hanover & Henrico, Rich-

mond, Virginia, for Appellee. **ON BRIEF:** Frank W. Dunham, Jr., Federal Public Defender, Alexandria, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

In the early evening of October 13, 2002, a Richmond police officer, in the course of responding to a call of "shots fired," detained Jimmie J. Pittman, conducted a pat-down of Pittman's pants pockets, and discovered a weapon. Pittman, a convicted felon, later was charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C.A. § 922(g)(1) (West 2000). After the district court denied his motion to suppress the evidence, Pittman entered a conditional plea of guilty, reserving the right to appeal the district court's ruling on his motion to suppress. On appeal, Pittman renews his motion to suppress, arguing that the officer's investigatory detention of him violated his Fourth Amendment right to be free from unreasonable searches and seizures. Because we find that Pittman's detention was supported by a reasonable articulable suspicion that criminal activity may have been afoot, and because the subsequent pat-down was justified in the interest of officer safety, we affirm.

I.

The evidence adduced at Pittman's suppression hearing showed the following. At approximately 6:00 PM on October 13, 2002, Officers Tricia A. Hamilton and Eugene J. Provost of the Richmond Police Department, riding separately in their own patrol cars, responded to a report of gunshots being fired in the vicinity of the 3700 block of Moody Avenue in Richmond, Virginia. According to Officer Hamilton, this block was in a "high crime area," and was a few blocks away

from Midlothian Village, an area with a particularly violent reputation. According to Officer Provost, the 3700 block of Moody Avenue was part of a "residential neighborhood" that did not "have a high volume of crime," but was "across the street from . . . Midlothian Village, where we have quite a few shootings and have had quite a few homicides." (J.A. at 55.)

Upon her arrival, Officer Hamilton viewed a number of people sitting or standing on a porch and noticed Pittman sitting in a blue car at the curb. Hamilton approached Pittman, spoke briefly with him, and then proceeded to the porch to speak with the people there.

Officer Provost arrived shortly thereafter and parked in front of Pittman's blue car. Pittman was sitting in the car with the door open and his feet outside the vehicle. Provost's attention was drawn to Pittman because Pittman was "looking directly at [Hamilton] and watching her every movement." (J.A. at 52.) Provost also noticed that Pittman was "reaching to the floorboard of the car making furtive movements." (J.A. at 52.) Based on Pittman's behavior, Provost "got a sixth sense" about Pittman and decided to approach the man. (J.A. at 56.) As he approached, Provost saw a large amount of candy wrappers and papers on the floorboard of the car and that Pittman was stuffing those wrappers into his pocket. As soon as Pittman saw him, Provost observed, "[he] looked like a deer in headlights. His eyes got real big, became nervous." (J.A. at 53.) When Provost asked Pittman if he had heard the gunshots in the area, Pittman became "even more nervous and started stuffing more stuff in his pockets even quicker." (J.A. at 53.) Provost then asked Pittman to keep his hands out of his pockets, asked him if he had a gun, and simultaneously placed his hand on Pittman's pocket. At this point, Pittman told Provost that he had a gun and that he was a convicted felon. Provost called Hamilton over, the two placed Pittman in handcuffs, and removed the handgun, a Derringer .22, from Pittman's pocket. Provost unloaded the gun and noted that it had been fired one time.

On January 23, 2003, a grand jury sitting in the Eastern District of Virginia returned a one-count indictment against Pittman, charging him with being a felon in possession of a firearm in violation of 18 U.S.C.A. § 922(g)(1). Pittman filed a motion to suppress the discovery of the firearm, arguing that Officer Provost did not have sufficient

basis to stop him and pat down his pocket. After hearing the evidence presented at the suppression hearing, the district court made the following findings on the record:

>   The court finds on the late afternoon of October 13th, 2002 Officers Hamilton and Provost responded to a call that alerted them to a gunshot being fired in the neighborhood on Moody Avenue. That Officer Hamilton had the primary duty of responding, and her back-up was Officer Provost. That after arriving at the area w[h]ere the notice indicated the shooting occurred Officer Hamilton found a number of people sitting or standing on a porch and the defendant sitting in his blue car at the curb. That she spoke to the defendant, and then decided that her primary assignment ought to be to talk to the people on the porch.
>
>   She goes up on the porch and has a conversation with some of the individuals there . . . .
>
>   In the interim, probably within a minute, Officer Provost pulled up in the same area and parked his car in front of the defendant Pittman, who by this time was sitting sideways in the left front seat of the car with his feet on the ground. Was engaged in some form of miscellaneous activity, either cleaning out his car of candy wrappers and things, but he appeared to be stuffing them in his pocket.
>
>   Now, whether, obviously, because of the notice of a shooting in the area these officers were apprehensive about their safety, and whether it was just a hunch, a gut feeling or sixth sense, Officer Provost parlayed it in to a belief that he may be in danger. And he therefore told the defendant, Pittman, to take his hands out of his pocket. And whether he either did it or did not, the officer decided that that pocket was so crammed full of debris and other things that he ought [t]o slap his hand on it. And when he slapped his hand on it, he discovered that there was a weapon of some sort that later turned out to be a .22 caliber Derringer.

(J.A. at 71-72.)

Based on these factual findings, the district court denied Pittman's motion to suppress, explaining as follows:

> I deny the defendant's motion to suppress, and the basic point that you will have to take to the Fourth Circuit is when you are apprehensive after having been notified to go to an area that is known to be a reasonably high crime area, and you have been notified of a gunshot, can you parlay your hunch, gut feeling or sixth sense into doing what was done here? I am ruling that you can. So that will give you a perfect hand to take to the Fourth Circuit, because I did not mince my findings. Whether you can parlay those three human attributes, hunch, gut feeling, or sixth sense in to a reasonably articulable suspicion is a neat question for the Fourth Circuit to answer.

(J.A. at 73.)

Pittman then entered a conditional plea of guilty and later was sentenced. Pittman now appeals, arguing that the district court erred in denying the motion to suppress.

## II.

### A.

When considering on appeal a motion to suppress evidence, we review a district court's factual findings for clear error and its legal determinations de novo. *United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004). "Because the district court denied the motion to suppress, we construe the *evidence* in the light most favorable to the government." *Id.* (emphasis added).

At oral argument, counsel for Pittman argued that our review of the evidence is limited only to those historical facts explicitly found by the district court. This assertion misapprehends our standard of review in these cases. While it certainly is true that we are bound to the district court's non-clearly-erroneous findings of fact, we look not only to those findings of fact, but also to the evidence adduced at the sup-

pression hearing. *See Perkins*, 363 F.3d at 320; *cf. United States v. Bethea*, 598 F.2d 331, 333-34 (4th Cir. 1979) (explaining that, when a district court fails to make express findings of fact on the record, we will uphold its denial of a motion to suppress if the evidence, viewed in the light most favorable to the Government, supports its ruling). This standard of review is pragmatic, recognizing that district courts frequently rule on motions to suppress from the bench and, from time to time, may omit relevant factual findings from their express findings of fact. While we certainly are not free, absent clear error, to credit evidence that the district court explicitly or implicitly discredited, our standard of review permits examination of the evidence adduced below and requires us to view that evidence in the light most favorable to the party prevailing below. *Perkins*, 363 F.3d at 320.

B.

"The Fourth Amendment protects citizens from 'unreasonable searches and seizures' by the government, and its protections extend to brief investigatory stops . . . that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). In such situations, the Fourth Amendment is satisfied if the officer's action is supported by a reasonable artibulable suspicion that criminal activity "'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30); *United States v. Christmas*, 222 F.3d 141, 143 (4th Cir. 2000). While such a detention does not require probable cause, it requires more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. Stated differently, "[a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Once a stop is conducted, "if the officer believes that the person being stopped 'may be armed and presently dangerous,' the officer may frisk the person by patting his outer clothing 'in an attempt to discover weapons which might be used to assault [the officer].'" *United States v. Mayo*, 361 F.3d 802, 805 (4th Cir. 2004) (quoting *Terry*, 392 U.S. at 30) (alteration in original). But, there must be a constitutional basis to conduct a *Terry* stop before such a frisk can be conducted. *United States v. Burton*, 228 F.3d 524, 527-28 (4th Cir. 2000) ("[A]n officer may not conduct this

protective search for purposes of safety until he has a reasonable suspicion that supports the investigatory stop.").

In assessing an officer's justification in making an investigatory stop, "we look at the 'totality of the circumstances'" to see whether the detaining officer had a "'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273. As we recently have explained, "relevant to the totality of circumstances are various individual factors traditionally relied upon by police officers, such as whether the stop occurred in a high-crime area, or whether the suspect engaged in evasive behavior or acted nervously." *Mayo*, 361 F.3d at 805-06 (citations omitted). Moreover, the inquiry is objective, not subjective:

> Whether a Fourth Amendment violation has occurred "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time," and not on the officer's actual state of mind at the time the challenged action was taken.

*Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)).

Here, an objective assessment of the totality of the circumstances reveals that Officer Provost's detention and pat down of Pittman was justified. First, as the district court found, the area in which the stop was conducted was known to be a "reasonably high-crime area."*

---

*Pittman argues that this finding was clearly erroneous because Provost testified that the area was not a high-crime area. It is true that Officer Provost stated that the area where Pittman was detained did not have "a high volume of crime." (J.A. at 55.) But, when this testimony is read in context, this statement appears much more equivocal: "It is a residential neighborhood. This area, we don't have a high volume of crime, however, across the street from there is Midlothian Village where we have quite a few shootings and have had quite a few homicides and also a school in that area." (J.A. at 55.) Moreover, Officer Hamilton testified at the suppression hearing that the area *was* a high crime area: "That is primarily categorized as one of our high drug areas, high crime areas. You have got areas of Moody, Lawson, Roanoke and Midlothian. Right down the street from Midlothian, 4000 block you have a lot of shootings within that whole area there, Midlothian Village." (J.A. at 32.) Based on this testimony, the district court's finding that the area was a "reasonably high crime area" was not clearly erroneous.

(J.A. at 73.) As explained in *Mayo*, although this factor may not be sufficient in and of itself to justify stopping an individual, "it is a factor that may be considered along with others to determine whether police have a reasonable suspicion based on the totality of the circumstances." *Mayo*, 361 F.3d at 807 (citation omitted).

A second relevant factor was Pittman's nervous demeanor. Officer Provost testified that he saw Pittman eyeball Officer Hamilton in a suspicious manner as she walked by him, and as he approached Pittman, Provost noted that Pittman looked like "a deer in headlights," explaining further that "[h]is eyes got real big, became nervous." (J.A. at 53.) This too is a factor that we have found may be considered as informing an officer's reasonable articulable suspicion. *Mayo*, 361 F.3d at 806, 807.

Third, Provost observed Pittman making furtive gestures. According to Provost, "[Pittman] was reaching to the floorboard of the car making furtive movements. And he was picking something up, or pushing something, I didn't know if he was pushing something under the seat or picking something up." (J.A. at 51, 53.) Provost also noted that Pittman "started stuffing more [debris] in his pockets even quicker" after being approached by Provost, which is highly unusual behavior. (J.A. at 53.) These furtive gestures in the presence of police officers also are relevant. *Id.* at 806.

Finally, Officers Hamilton and Provost were responding to a call that shots had been fired in the area where the detention occurred. The officers were thus on the look-out for an armed individual and had some reason to suspect that any of the individuals in the area of 3700 Moody might be the person who fired the shot. *Cf. Burton*, 228 F.3d at 528 (noting that officers conducting impermissible detention in that case were in the area serving outstanding warrants and not responding to a call of ongoing criminality).

In sum, the totality of the circumstances justified Provost's investigatory stop of Pittman. Provost was responding to a promiscuous shooting call in a reasonably high-crime area. He observed the nervous Pittman eyeballing Hamilton in a suspicious manner. When Pittman saw Provost, his anxiety was visibly heightened, and he looked like "a deer in headlights." (J.A. at 53.) In addition, Pittman was mak-

ing furtive movements in the floorboard of his car. These factors combined to give Provost a reasonable articulable suspicion that Pittman might be possessing a concealed weapon in violation of Virginia law. *See* Va. Code Ann. § 18.2-308 (Michie 1996) (making it unlawful to carry a concealed weapon without a permit). Because, based on the totality of the circumstances, Provost had reason both to detain Pittman and to believe that he was armed, Provost was justified in patting Pittman down in the interest of personal safety. *Mayo*, 361 F.3d at 807.

Notwithstanding the objective factors apparent from the evidence presented at the sentencing hearing, Pittman argues that, because the district court held that an officer could "parlay [a] hunch, gut feeling or sixth sense" into a basis for conducting a *Terry* stop, and because *Terry* itself explains that a "hunch" is not enough to justify a stop, *see* 392 U.S. at 27, the district court must be reversed. Pittman is correct in noting that a subjective "hunch" or "gut feeling" on the part of the officer is not enough to support a *Terry* stop. Indeed, whether the officer developed a subjective sense about impending criminal activity is completely irrelevant. *Macon*, 472 U.S. at 470-71. We are not concerned with the officer's subjective state of mind — only whether, viewed objectively, the facts and circumstances confronting the officer were sufficient to give a reasonable officer a particularized suspicion that criminality was afoot. *Id.* Thus, to the extent the district court based its ruling solely on the subjective state of mind of Officer Provost, it erred. Nevertheless, the historical facts found by the district court, along with other evidence in the record consistent therewith, show that the objectively-viewed circumstances confronting the officers were sufficient to justify a stop-and-frisk detention.

III.

For the forgoing reasons, we affirm.

*AFFIRMED*