UNITED STATES of America

v.

Fred L. MORTON, Defendant.

No. CRIM. 3:05CR256.

United States District Court,
E.D. Virginia,
Richmond Division.

Nov. 2, 2005.

Stephen W. Miller, Esquire, Matthew C. Ackley, Esquire, United States Attorney's Office, Richmond, VA, for United States.

Carolyn V. Grady, Esquire, Office of the Federal Public Defender, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

This matter is before the Court on Defendant's Motion to Suppress (Docket No. 15) a handgun confiscated from Defendant by police and Defendant's statement that he was a convicted felon, which he spontaneously uttered while being detained by officers investigating whether he was illegally in possession of a handgun. For the reasons set forth below, the motion is denied.

## STATEMENT OF FACTS

On December 30, 2004, Detective T. Walker received a telephone call from a confidential informant ("CI"), who previously had provided information to Walker which always had proved to be accurate. The CI, who identified himself when he called, had been a paid informant providing information to Walker since 2001, and throughout that time, the CI's information had resulted in the issuance of five arrest warrants and approximately a dozen arrests.

On December 30, 2004, the CI reported that, while he was in the Community Pride grocery store located in the 1900 block of

Mechanicsville Turnpike, he had seen a man carrying a handgun concealed under his long white T-shirt. The CI saw the handgun when the man lifted his T-shirt above his waist to show the CI the gun, which was in the man's pants pocket.

Walker asked for a description of the man, and the CI responded that he was a light-skinned black male, wearing a long white T-shirt under a dark colored jacket, blue jeans, blue and yellow Nike sneakers, a fitted baseball cap and a black glove on one hand. When asked about the color of the jacket, the CI said that he was not sure whether it was blue or black, but that it was one or the other. The CI did not provide any other descriptive information about the man.[1]

About five minutes after the CI's initial call, Walker, along with several other officers, set up a surveillance outside the Community Pride store. Upon arrival, Walker called the CI to ask the whereabouts of the suspect. At that time, Walker saw the CI walk from his vehicle in the parking lot into the store. A short time later, the CI appeared at the entrance to the store and called Walker to report that the suspect was no longer in the store. The CI reported that the suspect might have gone to Maddox Street, which is where the CI knew the suspect to "hang out."

The police officers immediately traveled to Maddox Street which is located one street away from Mechanicsville Turnpike, and according to Walker, is situated one to two blocks away from the Whitcomb Court housing projects. Walker, an experienced police officer, explained that Whitcomb Court is known to have a high incidence of crime and that he personally has come into contact with several individuals armed with handguns in the Whitcomb Court area. Walker also testified that other than the CI's tip, Walker knew nothing about Morton.

When Walker arrived on Maddox Street, he saw a light-skinned black man standing in the street with another man both of whom were talking to the driver of a parked vehicle. The light-skinned black man was wearing a black or blue jacket, a long white T-Shirt, and blue and yellow sneakers. The man had his hands in his pockets so that the only descriptor given by the CI which Walker could not visually verify was the report that the man was wearing a black glove on one hand.

Walker, who was wearing a black vest emblazoned with the word "POLICE" in yellow print, exited his unmarked vehicle, approached the defendant to determine whether, as reported by the CI, he was carrying a concealed weapon. As Walker approached Morton, Walker told Morton to remove his hands from his jacket pockets. Morton stared at Walker and did not remove his hands from his pockets. Walker drew his weapon and again ordered Morton to show his hands, but Morton remained frozen and did not comply. At that point, Sgt. Harrison, another of the officers on the scene, approached Morton from behind and held Morton's arms. Morton then took his hands out of his pockets, and the officers were able to handcuff him. Morton had a black glove on one hand. Walker moved closer to Morton, then saw a handgun in Morton's rear pants' pocket, patted down Morton, and retrieved a Glock–9 mm from Morton's pants pocket.

Morton began shouting obscenities at the officers. After he calmed down, and,

---

1. At the hearing on the motion, Walker testified that, at the time of arrest, Morton was wearing a blue "hoody," which Walker further described to be medium weight with a zipper.

without any questioning by the officers, Morton shouted to some people on a nearby porch that he was "gone for good" because he was a convicted felon. At that point, the officers arrested Morton and subsequently a grand jury indicted him for possession of a firearm by a convicted felon.

## DISCUSSION

■■■ The Fourth Amendment protects citizens from "unreasonable searches and seizures." U.S. Const. amend. IV. The jurisprudence animating the Fourth Amendment is well-settled that, in carrying out their duties, law enforcement officers temporarily may stop and detain a citizen "where [the] police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch' " of criminal activity. *Id.* at 27, 88 S.Ct. 1868. "If the officer believes that the suspect 'may be armed and presently dangerous,' the officer may frisk the person by patting his outer clothing 'in an attempt to discover weapons which might be used to assault [the officer].' " *United States v. Mayo*, 361 F.3d 802, 805 (4th Cir.2004) (*quoting Terry*, 392 U.S. at 30, 88 S.Ct. 1868). As the Fourth Circuit has made clear:

> An officer may encounter citizens and attempt to question them without implicating the Fourth Amendment. But during such a police-citizen encounter, an officer is not entitled, without additional justification, to conduct a protective search. To conduct such a protective search, an officer must first have reasonable suspicion supported by articulable facts that criminal activity may be afoot.

*United States v. Burton*, 228 F.3d 524, 528 (4th Cir.2000). To determine whether an officer had reasonable suspicion justifying a *Terry* stop, courts look at the totality of the circumstances to assess whether the "officer had 'a particularized and objective basis' for suspecting legal wrongdoing." *Mayo*, 361 F.3d at 805 (*quoting United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).

■■■ Under the totality of the circumstances test, a report of wholly legal activity can establish reasonable suspicion when combined with additional circumstantial factors. *See Illinois v. Wardlow*, 528 U.S. 119, 125–26, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Indeed, the purpose of *Terry* stops are to stop illegal activity before it occurs. *Id.*

■■■ Moreover, courts must give credit to the "practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993). Consequently, "The Supreme Court has consistently rejected the notion that courts can second-guess police officers by speculating on possible innocent reasons for a defendant's actions." *United States v. Perkins*, 363 F.3d 317, 327 (4th Cir.2004) (*citing Arvizu*, 534 U.S. at 277–78, 122 S.Ct. 744 (2002)).

■■■ In assessing the totality of the circumstances, courts must look to "factors traditionally relied upon by police officers, such as whether a stop occurred in a high-crime area, or whether the suspect engaged in evasive behavior or acted nervously," *Mayo*, 361 F.3d at 805–06 (citing cases where such activity was present) (internal citations omitted), as well as information relayed from an informant. *Florida v. J.L.*, 529 U.S. 266, 268, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous tip); *Adams v. Williams*, 407 U.S. 143, 146–47,

92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (reliable known informant tip); *Perkins*, 363 F.3d at 320 (quasi-anonymous informant). These general principles guide the resolution of Morton's motion to suppress.

## A. Reliability Of The Confidential Informant

■ If an informant's tip is relied upon as part of the justification for a *Terry* stop, the tip must possess "sufficient indicia of reliability." *Perkins*, at 323 (*citing J.L.*, 529 U.S. at 270, 120 S.Ct. 1375; *Adams*, 407 U.S. at 147, 92 S.Ct. 1921). The reliability assessment tests the veracity of the informant and the basis of his knowledge, and, consequently, whether his information is credible enough to provide the basis for the reasonable suspicion required to conduct a *Terry* stop. *See Alabama v. White*, 496 U.S. 325, 328–39, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *J.L.*, 529 U.S. at 272, 120 S.Ct. 1375.

In discussing "the reliability needed for a tip to justify a *Terry* stop," the Supreme Court also has held that "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272, 120 S.Ct. 1375. The Court explained that "[a]n accurate description of a subject's readily observable location and appearance is of course reliable" in the sense that "it will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity." *Id.*[2]

■ Several factors in this case establish that the confidential informant here was reliable. The CI revealed his name to Walker and previously had provided tips that had resulted in arrests and convictions. *Adams*, 407 U.S. at 146, 92 S.Ct. 1921 (informant known to officer and who had provided reliable information in the past held to be reliable). Unlike an anonymous informant, the CI, who was known to the police, would be subject to criminal prosecution if he had lied to law enforcement. *See id.* at 146–47, 92 S.Ct. 1921. Because the CI's tips previously had proved credible, Walker reasonably could conclude that the tipster was reliable and, therefore, that his tip also was likely to bear fruit.

Morton intentionally, albeit surreptitiously, displayed his gun to the informant. Because the informant observed from close proximity the suspect's suspicious conduct, the informant's basis for knowledge was strong. *Perkins*, 363 F.3d at 322 (a tipster's close proximity to the suspect at the time the suspect was engaged in suspicious activity bolsters a tips reliability).

Because the informant relayed the suspicious conduct to Walker only moments after observing it, there was little time for fabrication or dilution of the truth or forgetting key facts or details. The close spacial and temporal proximity present in this case supports finding that both the tipster and the tip were reliable. *Perkins*, 363 F.3d at 322 ("the tipsters basis of knowledge—contemporaneous viewing of the suspicious activity—enhanced the tip's

**2.** The United States argues that the dual reliability requirements—identity and criminality—stated in *J.L.* only apply in cases involving anonymous informants, not in all informant cases. *Supplemental Brief of the United States* (Docket No. 27 at pp. 11–12). The Supreme Court has not decided that issue. However, some Fourth Circuit decisions indicate, but

not with decisive clarity, that *J.L.*'s dual requirements only apply in anonymous tip cases. *See United States v. Brown*, 401 F.3d 588, 596 (4th Cir.2005); *Perkins*, 363 F.3d at 329, 330 (Michael, J., dissenting); *United States v. Christmas*, 222 F.3d 141, 143 (4th Cir.2000). It is unnecessary to decide that issue in this case.

reliability"); *United States v. Cephas*, 254 F.3d 488, 495 (4th Cir.2001) (*citing Christmas*, 222 F.3d at 144 (4th Cir.2000) (reasoning that face-to-face encounter with informant who provided tip when close in time and distance from the alleged illegal activity bolstered credibility of the informant)).

Also, the informant provided a detailed description of the suspect and that description was almost entirely verified when the officers reached the scene. The informant told Walker that the suspect was a light-skinned black male, wearing a blue or black jacket, yellow and blue Nike sneakers, one black glove, and a fitted hat. Upon arriving at Maddox Street, Walker verified all the descriptors stated by the informant except one (because the suspect had his hands in his pocket, Walker could not confirm whether he wore a black glove on one hand). Therefore, it is clear that the record here satisfies the requirement that reliability as to identity be established. *J.L.*, 529 U.S. at 272, 120 S.Ct. 1375 (accurate description of suspect's identity is an essential component of a reliable tip). Having corroborated these components of the tip, it was reasonable for Walker to believe that the tipster's allegations that the suspect was carrying a gun also were true. *See White*, 496 U.S. at 332, 110 S.Ct. 2412 (corroboration of anonymous tip established reliability justifying *Terry* stop); *Adams*, 407 U.S. at 147, 92 S.Ct. 1921 (verified non-anonymous tip held reliable justifying *Terry* stop); *Perkins*, 363 F.3d at 322 (corroboration of semi-anonymous tip helped establish reasonable suspicion).

Morton does not disagree that the informant previously had proved reliable. Instead, he contends that the informant's description swept too broadly and failed sufficiently to single out Morton as the suspect. In particular, Morton argues that the lack of information about height, weight, age, dental or facial feature details, and the color of the cap rendered the description insufficiently reliable to satisfy the test set by *J.L.*.

However, the description of the style and color of the suspect's clothing was sufficiently unique to protect against an erroneous identification of the wrong person. Moreover, the informant's tip included a predictive component: that the suspect would likely be found on Maddox Street, a place where the CI previously had observed him to "hang out." When the officers arrived at Maddox Street only moments later, they observed a person matching the CI's description. Because the informant was known to Walker, had provided reliable, fruit-bearing tips in the past, had observed Morton's suspicious behavior within close proximity, relayed this conduct to law enforcement within a short time after observing it, and had described the suspect's appearance and location with sufficient specificity, the tip was reliable.

That, of course, is not the end of the inquiry because to conduct a *Terry* stop and frisk, law enforcement must have reasonable suspicion that "criminal activity may be afoot." *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. On this record, even though the tip was entirely reliable, the officers could have had reasonable suspicion that criminal activity was afoot only if carrying of a concealed handgun is illegal under Virginia law or, if not, if the circumstances otherwise gave the officers reasonable suspicion to know that Morton was not carrying the gun legally. The circumstances here provided no basis for a reasonable articulable conclusion that criminal activity was or may have been afoot, other than the fact that he was carrying a concealed handgun. Thus, it is necessary to ascertain whether under Virginia law carrying a concealed weapon is unlawful.

## B. Carrying a Concealed Handgun Is a Crime in Virginia.

The United States argues that Virginia's concealed handgun law, *Va.Code Ann.* § 18.2–308(A) (2005), makes the carrying of a handgun a crime and that the statutory provision that allows the carrying of a concealed weapon with a permit (§ 18.2–308(D)) provides an affirmative defense to that crime. The defendant argues that Walker had no reason to believe that Morton did not have a permit to carry a concealed handgun. On this record, that assertion is correct. Therefore, says Morton, Walker could not have suspected reasonably that criminal activity was afoot.

The decision in *United States v. Mayo* can be read to hold by implication that carrying of a concealed handgun is a crime in Virginia. *Mayo,* 361 F.3d at 808. In *Mayo,* officers noticed Mayo engaging in evasive, nervous conduct, with his hand positioned in a jacket pocket in manner suggesting that he was holding a handgun. The police stopped Mayo, patted him down, and found a concealed handgun in his jacket pocket. The Fourth Circuit upheld the seizure and, in so doing, stated, "The frisk itself amounted to a patting of Mayo's outside clothing, which revealed the gun. *At that point,* the officers had probable cause to arrest Mayo and to search him incident to an arrest..." *Id.* (emphasis added). If the officers had probable cause to arrest Mayo the moment they found the concealed handgun, that could only be because the Fourth Circuit considered the carrying of a concealed handgun to be a crime in Virginia. *See Mayo,* 361 F.3d at 803–05 (the officers did not know of any other facts that would have made Mayo's carrying of a concealed handgun per se illegal.) However, because the Fourth Circuit did not explicitly interpret the statute in *Mayo,* it is necessary to do so here.

The Supreme Court of Virginia never has addressed this issue. However, a panel of the Court of Appeals of Virginia stated in a footnote that:

> Code § 18.2–308(D) provides that it is unlawful to carry a weapon concealed from observation *unless* a person has a permit to do so. Thus, the fact that Officer Bolen may have believed that Reittinger was armed would not be a reason to suspect that he was illegally carrying a concealed weapon, and, in that regard committing a crime. In Virginia, the fact that a person may be armed does not provide a reason to suspect that the person is violating the law. (emphasis in original) [citations omitted].

*Reittinger v. Commonwealth,* 28 Va.App. 80, 502 S.E.2d 151 (1998) (citing precedent from out of state or only analogously related), *en banc reh'g granted by* 28 Va.App. 269, 503 S.E.2d 812 (1998), *rev'd en banc by* 29 Va.App. 724, 514 S.E.2d 775 (1999), *rev'd by* 260 Va. 232, 532 S.E.2d 25 (2000). However, the Court of Appeals provided no reasoning or interpretative basis for this conclusion. Moreover, *Reittinger* was reheard and reversed *en banc,* then appealed to the Supreme Court of Virginia, which then reversed the *en banc* decision and remanded the case to the trial court. Thus, the text of the footnote has no precedential effect. Because, in its review of *Reittinger,* the Supreme Court of Virginia did not address the point raised in the Court of Appeals' footnote, the footnote only represents how two judges of the Court of Appeals of Virginia interpreted § 18.2–308(A) and (D).

By contrast, a close examination of the structure of § 18.2–308, the model jury instructions used when a violation of this statutory provision is charged, decisions construing similar statutes in other states,

and practical considerations respecting enforcement of the statute lead to the conclusion that § 18.2–308(A) establishes the substantive offense of carrying a concealed weapon and that the permit provision stated in clause (D) is not an element of the crime.

Section 18.2–308(A) defines the prohibited conduct by providing that: "If any person carries about his person, hidden from common observation, (i) any pistol, revolver ... he shall be guilty of a Class 1 misdemeanor." *Va.Code Ann.* § 18.2–308(A). Clauses (B) and (C) identify the persons to whom the statute does not apply. Clause (D) provides that any person 21 years or older who meets all of the rigorous conditions set forth in that clause may apply for a permit which, if granted, will permit the holder thereof to carry a concealed handgun. Clause (A) makes no mention of the specific exemptions of clause (B) and (C) nor of the permit provision stated in clause (D). This statutory structure makes it relatively clear that the prohibited conduct is the carrying about one's person of a concealed weapon and that one can be exempted from the prohibitive reach of the statute if covered by one of the explicit statutory exemptions or, if not, by securing a permit to engage in the conduct that is otherwise prohibited by the first clause.

This interpretation of the statute is mirrored in the standard instructions given to juries in Virginia's courts when a violation of § 18.2–308 is charged. Under the instructions, the Commonwealth must prove "(1) [t]hat the defendant was carrying (name of weapon listed in § 18.2–308) about his person; and (2)[t]hat this weapon was hidden from common observation." *Virginia Model Jury Instruction, Criminal,* Vol. I, No. I–497 (2004 Repl. ed.). At oral argument on the motion to suppress, counsel for the defendant agreed that these two components were the elements of the crime of carrying a concealed weapon and that the permit provision was not such an element.

Decisions from other jurisdictions with concealed firearm statutes similar to the one in Virginia reinforce this interpretation of the statute. *See Allen v. State,* 86 Ga.App. 604, 71 S.E.2d 870, 870 (1952) (once the state makes a prima facie case by proving that defendant had a pistol, the burden shifts to the defendant to show that he had a license to carry it); *Ezzard v. State,* 229 Ga. 465, 192 S.E.2d 374, 375 (1972) (same); *Williams v. United States,* 237 A.2d 539, 541 (D.C.App.1968) (same); *Newman v. State,* 751 N.E.2d 265 (Ind.Ct. App.2001) (same); *Commonwealth v. Bigelow,* 250 Pa.Super. 330, 378 A.2d 961, 963 (1977) (possession of permit to carry concealed handgun is defense to crime, not element); *Commonwealth v. Poindexter,* 248 Pa.Super. 564, 375 A.2d 384, 387 (1977) (same); *Mackall v. State,* 283 Md. 100, 387 A.2d 762, 769 (1978) (license must be shown as affirmative defense); *People v. Henderson,* 391 Mich. 612, 218 N.W.2d 2, 4 (1974) (same for law prohibiting concealed weapon in vehicle); *State v. Bowdry,* 337 N.W.2d 216, 219 (Iowa 1983) (state not required to prove that defendant did not have a permit); *State v. Poupard,* 471 N.W.2d 686, 689 (Minn.App.1991) (burden of proof on defendant to show he had a concealed handgun permit); *People v. Superior Court of Santa Barbara,* 2 Cal. App.3d 197, 82 Cal.Rptr. 463, 466 (1969) (same). *See generally* Dag E. Ytreberg, Annotation, *Burden Of Proof As To Lack Of License In Criminal Prosecution For Carrying Or Possession Of Wapon Without License,* 192 A.L.R.3d 1054 (2005).

█ This interpretation is logical and achieves the statutory purpose of the prohibitive provision of the statute. By defining the crime as the carrying of a con-

cealed weapon, the General Assembly made it possible for law enforcement officers to identify and react to simple objective criteria. Then, by providing a long list of exemptions from the prohibited conduct, the General Assembly made it possible for citizens to demonstrate facts that would render lawful conduct that is otherwise unlawful. But, those facts are knowable only by the citizen who qualifies for a statutory exemption or who has a permit. Given the rapidity with which law enforcement must react to the events transpiring on the streets, they cannot be expected reasonably to know whether an otherwise unknown person is protected by an exemption or possesses a permit. *See* § 18.2–308(B)–(D). This conclusion is bolstered by the general evidentiary principle that the government ordinarily is not required to prove a negative: here, to prove that the citizen does not have a concealed handgun permit or is otherwise exempt from the statute. *See e.g. United States v. Denver & R.G.R. Co.,* 191 U.S. 84, 92, 24 S.Ct. 33, 48 L.Ed. 106 (1903) ("It is a general rule of evidence, noticed by the elementary writers upon that subject (1 *Greenl. Ev.* § 79) that 'where the subject-matter of a negative averment lies peculiarly within the knowledge of the other party, the averment is taken as true unless disproved by that party.'"). Thus, it is reasonable to construe the statute to place on citizens the burden of proving facts that demonstrate the possession of a permit or the protection of an enumerated exemption.

 Consistent with the requirements of Fourth Amendment jurisprudence, this interpretation of the statute allows a law enforcement officer who has reasonable, articulable suspicion that a person is carrying a concealed handgun in Virginia briefly to detain the person to ascertain whether the conduct is prohibited or not. This, of course, is what happened in Morton's case.

## CONCLUSION

The record here establishes that a reliable informant provided a reliable tip that Morton was engaged in criminal activity, specifically a violation of Va.Code Ann. § 18.2–308(A). Thus, when he approached Morton, Walker had a reasonable articulable suspicion that criminal activity might have been afoot. He was entitled to stop Morton to inquire whether that suspicion was grounded.

 In connection with that stop, Walker was entitled to take action to protect himself from exposure to harm if Morton, in fact, possessed a concealed weapon and decided to use it. *Terry,* 392 U.S. at 30, 88 S.Ct. 1868; *Mayo,* 361 F.3d at 808. When Morton refused to comply with Walker's instruction to remove his hands from the pockets of his jacket, it was permissible for Walker to draw his weapon to protect himself and for Harrison physically to seize Morton so that the investigation respecting the criminal activity that might be afoot could be completed while protecting the officer's safety. *Terry,* 392 U.S. at 30, 88 S.Ct. 1868; Wayne R. LeFave, *Search and Seizure,* § 9.2(d), (4th ed.) at n. 98 and accompanying text (citing case law upholding drawing of a gun by officers to protect themselves during a *Terry* stop); *see Terry,* 392 U.S. at 33, 88 S.Ct. 1868 (Harlan, J., concurring) ("There is no reason why an officer, rightfully but forcibly confronting a persons suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet."). It was during that encounter when Walker saw the concealed weapon. And, immediately thereafter Morton began cursing and then disclosed that he was a convicted felon. Knowing those facts, Walker rightfully arrested Morton for the offense with which he is charged, possession of a firearm by a convicted felon.

On this record, the Defendant's Motion To Suppress (Docket No. 15) is Denied.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.