PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.                                    No. 06-4986

SEAN D. BLACK,
        *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(3:06-cr-00031-REP-AL)

Argued: December 7, 2007

Decided: May 14, 2008

Before NIEMEYER and GREGORY, Circuit Judges, and
Henry F. FLOYD, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the majority
opinion, in which Judge Floyd joined. Judge Gregory wrote a dissent-
ing opinion.

## COUNSEL

**ARGUED:** David Lassiter, Jr., JEFFERSON & LASSITER, Rich-
mond, Virginia, for Appellant. Richard Daniel Cooke, Assistant
United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Chuck

Rosenberg, United States Attorney, Matthew C. Ackley, Special
Assistant United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Richmond, Virginia, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

During the course of a voluntary citizen-police encounter, City of
Richmond (Virginia) police seized Sean Black, in a constitutional
sense, patted him down, and, after discovering an illegal firearm,
arrested him. Along with the firearm, heroin was then recovered from
Black's person. Black was ultimately convicted of possession of a
firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1),
and possession of heroin, in violation of 21 U.S.C. §§ 841 and 844.
The district court sentenced Black to 360 months' imprisonment,
which was based on a one-level upward departure under the district
court's Sentencing Guidelines calculation.

On appeal, Black challenges the district court's denial of his
motion to suppress, contending that the Richmond police did not have
the reasonable suspicion necessary to seize him and thus violated his
Fourth Amendment rights. He also challenges the reasonableness of
the district court's sentence. For the reasons that follow, we affirm.

I

On the evening of December 17, 2005, City of Richmond Police
Detective Sean Adams, Detective Daniel Minton, and Officer Perry
Barber were driving in a marked patrol car through the Mosby Court
area of Richmond, a "high-crime" neighborhood that had been desig-
nated as a target of the police department's violent crime reduction
initiative, to increase police visibility in that area. Detective Adams
knew the neighborhood to be a high-crime area, and he had made
numerous arrests for drugs and trespassing in Mosby Court in his 12
years as a police officer.

Around 9:00 p.m., the officers pulled into a parking spot near 1336
Coalter Street, a building posted with "No Trespassing" signs, which

the police department was authorized to enforce. A group of four or five people were gathered near a breezeway in front of the building, but when the officers arrived, they immediately dispersed in different directions. As the officers exited the vehicle, Sean Black, who was standing about thirty feet from the breezeway, started walking across the street past the passenger side of the police car. When Detective Adams asked Black, "Hey man, do you live out here?" Black stopped, turned to Adams, and said that he lived across the street at 1312 Coalter, which was the direction toward which he had been walking. After turning his flashlight on Black's midsection, Detective Adams noticed that Black's left hand was outside of his coat pocket, but his right hand was awkwardly inserted halfway in his right coat pocket and was "cupped," as if grasping an object. Adams, concerned about the possibility of a weapon in Black's pocket, asked Black, "Can you take your hand out of your pocket?" Black did not respond either verbally or by removing his hand from his pocket. When Adams repeated the request, Black took his hand out of his pocket. Adams then saw a bulge "6 to 8 inches long along the bottom of the pocket" and "1 to 1½ inches high" that "appeared to have a flat side." Adams suspected that the object was a firearm. Detective Minton, who was standing behind Black, also discerned a bulge in the pocket but did not see its shape as clearly.

The following exchange then occurred between Detective Adams and Black:

> ADAMS:   What's in your pocket?
>
> BLACK:   Huh?
>
> ADAMS:   What's in your pocket?
>
> BLACK:   Nothing.
>
> ADAMS:   What?
>
> BLACK:   My money and my ID.

Adams believed Black's answer to be flatly inconsistent with the shape of the object in Black's pocket, which appeared to be the slide of a semi-automatic handgun.

Black then put his hand back into his right coat pocket, and Detective Adams "became nervous." Adams placed his hand on his gun and said, "[T]ake your hand out of your pocket. I don't want to have to shoot you." Black removed his hand from his pocket, and Adams ordered Black to move to the police car where Adams patted him down. Adams immediately confirmed that the bulge in Black's right coat pocket was a firearm. Adams then handcuffed Black and removed a Ruger semi-automatic handgun from Black's pocket, which was loaded and had a round in its chamber. When Black acknowledged that he did not have a concealed-carry permit for a weapon and that he was a convicted felon, the officers placed Black under arrest. From the search that followed, the officers recovered from Black's person a razor blade and individually wrapped baggies of an off-white rock-like substance that was later determined to be heroin.

Before trial, Black filed a motion to suppress the evidence seized from him, contending that the seizure by the officers violated his Fourth Amendment rights and was not justified by a reasonable suspicion of criminal wrongdoing, as required by *Terry v. Ohio*, 392 U.S. 1 (1968). Following a hearing on the motion, the district court found the facts stated above. It then concluded that the encounter between Detective Adams and Black was initially a voluntary citizen-police encounter, as described in *Florida v. Bostick*, 501 U.S. 429, 434 (1991), but that during the encounter Black was "seized" in a constitutional sense "when Officer Adams told Black to take his hand out of his pocket because he didn't want to have to shoot him." The court held, however, that the seizure was justified because at that point in time the officers had a reasonable, articulable suspicion that Black was illegally carrying a firearm. Accordingly, the court denied Black's motion to suppress.

After the jury convicted Black, the district court sentenced him to 360 months' imprisonment, which was based on a one-level upward departure under the Sentencing Guidelines. The government moved for an upward departure based on Black's criminal history. Because Black's criminal history was already at the maximum Category VI, the way to reflect an underrepresentation of this history was to increase the offense level. *See* U.S.S.G. § 4A1.3(a)(4)(B). The government observed:

The nature and sequence of the defendant's prior criminal record are significant here. In 1989, Sean Black, who was fifteen at the time, killed Everett Hubbard in Richmond, Virginia after Hubbard had taken a bag of narcotics from him. Black shot Hubbard twice in the back and once in the head. Black was convicted of voluntary manslaughter and served approximately two years in prison. Less than a year after his release, he committed new crimes, including receiving stolen property. Black was arrested for possession of cocaine on July 14, 1994, and gave a false name during the booking process. He also severely beat a man and was later convicted of malicious wounding. Black served approximately 10 years in prison, and was paroled on May 24, 2005. Within two weeks, he violated his parole by violently acting out at his treatment program. He was referred to an inpatient treatment program, and was released from that on August 17, 2005. He committed the instant offenses on December 17, 2005. Over the course of his years of incarceration, Black incurred 61 institutional infractions, including violent offenses.

The district court granted the government's motion to increase the Guidelines recommendation, explaining:

In my judgment the criminal history category . . . significantly underrepresents the serious[ness] of the defendant's criminal history, even though it's the most serious of criminal histories, and it certainly underrepresents the likelihood that the defendant will commit further crimes.

He, in fact, has proved the likelihood of committing further crimes after the offense of conviction [in this case] by committing further crimes, two further crimes. One is to threaten someone with bodily harm. The other is to effectuate it with aggravated assault.

The court concluded under 18 U.S.C. § 3553(a) that the enhanced sentence best served the goals of federal sentencing and imposed a 360-month sentence.

From the district court's judgment, Black appeals, challenging the district court's denial of his motion to suppress and the reasonableness of his sentence.

II

The parties agree that the encounter between Black and Detective Adams on December 17, 2005, began as a consensual encounter. Black argues, however, that when he was seized during that encounter — when Adams ordered Black to take his hand out of his pocket because he did not want to have to shoot him — his Fourth Amendment rights were violated because the officers did not have a reasonable suspicion at that time that he had committed or was committing a crime. Black does not contend that the district court's factual findings were clearly erroneous. Rather, he argues that the facts leading up to his seizure were insufficient as a matter of law to support a *Terry* seizure.[1] Relying on *United States v. Burton*, 228 F.3d 524 (4th Cir. 2000), Black asserts that the police had no right to pat him down merely because he exercised his clearly established "legal right to choose not to respond to the directive to remove his hand from his pocket" during a consensual encounter. As he summarizes the facts:

> Black was simply walking home on a cold night with his hand partially closed inside of his coat pocket. Officer Adams was looking for a "legal" reason to pat down an individual in the area. As the officers approached Black, all he did was continue [to] walk in the same non-evasive manner

---

[1]Our dissenting colleague argues for a different point, earlier in time, during the citizen-police encounter at which Black was seized so as to be able to argue that *at that point* the officer did not have a reasonable suspicion to conduct a *Terry* stop. In doing so, however, the dissent ignores the conclusion reached by the district court that Black was seized "when Officer Adams told Black to take his hand out of his pocket because he didn't want to have to shoot him." J.A. 148. Black did not challenge that ruling in his brief, nor has he challenged any factual finding by the district court upon which that ruling was based. Instead, Black focused his sole argument on whether, *at the time of the seizure found by the district court*, the officers had a reasonable suspicion to make a *Terry* stop. *See* Brief of Appellant at 12.

and exercise his legal right to choose not to respond to the directive to remove his hand from his pocket.

He argues that the officer's "nervousness" was at most a "subjective belief" or a "hunch," not evidence that criminal activity was afoot.

The government contends that when Detective Adams seized Black, he had a reasonable suspicion that Black had an illegal concealed weapon in his pocket, in violation of Virginia Code § 18.2-308 (making concealed carry of a weapon without a permit unlawful), much in the manner that justified a *Terry* stop in *United States v. Mayo*, 361 F.3d 802, 807-08 (4th Cir. 2004). Accordingly, the government maintains that Detective Adams was entitled to conduct a brief investigatory stop under *Terry v. Ohio* and then to frisk Black out of legitimate safety concerns.

To the extent that we are reviewing the district court's factual findings, we do so for clear error, and to the extent we are reviewing its legal determinations on the basis of those facts, we review *de novo*. *See United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004). And "[b]ecause the district court denied the motion to suppress, we construe the evidence in the light most favorable to the government." *Id.*

We begin by noting that voluntary citizen-police encounters do not implicate the Fourth Amendment. Although the Fourth Amendment prohibits unreasonable seizures of persons, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). "Police may question citizens without implicating Fourth Amendment protections. . . . Indeed, officers remain free to seek cooperation from citizens on the street without being called upon to articulate any level of suspicion or justification for their encounters." *Burton*, 228 F.3d at 527 (citing *INS v. Delgado*, 466 U.S. 210, 216 (1984)). Because such encounters are voluntary, a citizen approached by a police officer in this way has the "right to ignore his interrogator and walk away." *Terry*, 392 U.S. at 33 (Harlan, J., concurring). Indeed, a citizen need not even leave the area to avoid speaking with the police; he has a "right to go about his business or to stay put and remain silent in the face of police questioning." *Illinois v. Wardlow*,

528 U.S. 119, 125 (2000); *Burton*, 228 F.3d at 528. The fact that a police officer seeks cooperation or information by itself, however, does not establish a seizure. *See Schultz v. Braga*, 455 F.3d 470, 480 (4th Cir. 2006).

But when a police officer, during a voluntary encounter or otherwise, "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," the officer may temporarily seize and detain a citizen. *Terry*, 392 U.S. at 30. Moreover, in connection with such a seizure or stop, if presented with a reasonable belief that the person may be armed and presently dangerous, an officer may conduct a protective frisk. *Adams v. Williams*, 407 U.S. 143, 146 (1972); *see also Mayo*, 361 F.3d at 806-07. In determining whether a *Terry* stop is supported by reasonable suspicion, we determine whether the "totality of the circumstances" presented the detaining officer with a "particularized and objective basis" to conclude that a crime may have been committed or was being committed. *Mayo*, 361 F.3d at 805 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotation marks omitted).

In this case, during the encounter with Black, which was initially voluntary, Detective Adams was presented with the following circumstances, all of which were known or experienced before Adams effected a *Terry* seizure of Black:

*First*, the encounter occurred in a high-crime area that Detective Adams knew to be a locus of drug — and firearm — related criminal activity. His patrol arrived in the area as part of a Richmond initiative to reduce violent crimes, and he personally had made numerous arrests in Mosby Court.

*Second*, when police initially spoke with Black, he had his left hand out of his pocket and his right hand awkwardly inserted halfway in his right-hand pocket, "cupped" as if "grasping an object."[2]

---

[2]The dissent makes much of the point that Black cupped his hand in his pocket simply in response to the temperature of a winter evening. Indeed, the opinion goes to some lengths to suggest that a cupped hand

*Third*, Black hesitated to remove his hand from his pocket, without saying either yes or no, in response to Detective Adams' request.

*Fourth*, after Black did remove his hand, Detective Adams saw a bulge which was "6 to 8 inches long along the bottom of the pocket," "1 to 1½ inches high," and "appeared to have a flat side." Detective Adams stated that he suspected the object was a firearm.

*Fifth*, Black apparently lied about what the object in his pocket was, stating first that he had "nothing" in his pocket and then stating that it was "money and my ID." Neither answer explained the large bulge.

*Sixth*, after Detective Adams engaged Black in the conversation and Black surely recognized that Detective Adams did not believe his statements about what was in his pocket, Black put his hand back in the pocket where the suspected gun was.

Only at this point in the encounter did Detective Adams put his hand on his own gun and tell Black, "[T]ake your hand out of your pocket. I don't want to have to shoot you." Adams then ordered Black to move to the police car and thus had effectively seized him for Fourth Amendment purposes.

In the totality of these circumstances, we conclude that Detective Adams had a reasonable suspicion that Black had a firearm concealed in his pocket, in violation of Virginia law, and therefore was justified in conducting a *Terry* stop and patting Black down. *See Mayo*, 361

---

was the natural posture for a cold hand in the pocket. This argument, however, ignores the facts that Black's hand was not fully in the pocket but was half in the pocket, cupped over something that was there, and that the other hand was not in a pocket at all. As the officer testified, "I could see that his left hand was empty and at his side, but his right hand was in his lower coat pocket . . . partially into his pocket." J.A. 62. Moreover, it disregards the district court's factual findings that "Mr. Black did appear to be cupping his hand around something in his pocket," J.A. 150, and the "officer thought that the hand was grasping an object. It was into the pocket above the knuckles," J.A. 143.

F.3d at 807 ("But the fact that Mayo removed his hand from his pocket did not reduce the level of suspicion that the officers had that Mayo was violating the law by carrying a concealed weapon without a permit.") (emphasis omitted). Surely, there could be other explanations for Black's actions and what the officers observed, but a reasonable suspicion need not rule out all innocent explanations; it need only be a suspicion, albeit a reasonable one. As the Supreme Court has stated, "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. Even where each individual factor "alone is susceptible of innocent explanation," the question is whether, "[t]aken together," they are sufficient to "form a particularized and objective basis" for an officer's suspicions. *Id.* In the totality of the circumstances noted, we conclude that Detective Adams had a reasonable articulable suspicion that Black was concealing a firearm, and with that suspicion, he was then entitled, in the circumstances of this case, to pat Black down for the officers' safety. *See Adams*, 407 U.S. at 146; *Mayo*, 361 F.3d at 806-07.

Accordingly, we affirm the district court's order refusing to grant Black's motion to suppress.

### III

Black also contends that the district court erred in departing upward by one level in calculating the recommended Guidelines sentence. Our careful review of the record, however, reveals that the district court amply articulated its reasons for granting the government's motion to depart upward based on the substantial underrepresentation of the seriousness of Black's criminal history. The court also considered the increased sentence in light of the factors in 18 U.S.C. § 3553(a), determining that the enhanced sentence would serve the goals of federal sentencing. Finding no procedural or substantive error in sentencing, we are unable to conclude that it was unreasonable and therefore affirm. *See Gall v. United States*, 552 U.S. ___, 128 S. Ct. 586, 597-98 (2007).

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

GREGORY, Circuit Judge, dissenting:

I cannot accept that Fourth Amendment protections are suspended or reduced in so-called "high-crime" neighborhoods. Because the majority's opinion significantly lowers those constitutional protections for law-abiding citizens who, by choice or for reasons beyond their control, live in high-crime areas, I am compelled to dissent.

I.

In its recitation of the facts, the majority indicates that Black was thirty feet from the breezeway when he began his walk across the street, yet fails to note that Black was not amongst the group that fled moments before. (Majority Op. 3.) Although the group dispersed mere feet from where Black was walking, at no time did the officers speculate that Black was a member of that group. To the contrary, both sides agree that Black approached the police car from a completely different direction.[1] When asked if he lived in the area, Black responded that he lived at an address across the street, a response consistent with the direction in which he was walking. It is undisputed that upon first seeing the officers, Black continued on his way and exhibited no suspect or evasive behavior. Neither the officers nor the Government point to any evidence in the record linking Black to seemingly criminal activity prior to his encounter with the police. Yet despite Black's compliance, the police continued to question him, apparently unnerved that Black was "cupping" his hand in his pocket on that cold December evening.

The majority writes that Officer Adams asked Black to take his hand out of his pocket because Adams was "concerned about the possibility of a weapon in Black's pocket." (Majority Op. 3.) However, "cupping" a hand does not indicate that one is carrying anything at all. Rather, cupping is the natural, relaxed position of a hand when placed in the warmth of a pocket. As such, to expect a man with his hand in his pocket to hold that hand stiffly open defies common sense. It

---

[1] In its brief, the Government explained that "[a] man later identified as the defendant, Sean Black, was standing approximately 30 feet off to the side of this group and began to walk in the direction of the officers *as the group fled*." (Appellee's Br. 5 (emphasis added).)

would be far more unusual, and therefore suspicious, to observe someone holding his hand in his pocket in a completely straight and rigid position. Furthermore, as Black's counsel noted during oral argument, Black's having his hand cupped in his pocket is behavior completely consistent with the temperature on a winter evening in Richmond. In short, a "cupped" hand is nothing more than a relaxed hand and cannot create the sort of reasonable articulable suspicion required to justify a police search and seizure.

Without any suspicious behavior on the part of Black to justify his seizure, the majority is left with a de facto rule that allows police to search and seize anyone who finds himself in a "high-crime area." The majority begins its analysis by stating that the Mosby Court area of Richmond[2] where these events occurred is "a 'high-crime' neighborhood that had been designated as a target of the police department's violent crime reduction initiative, to increase police visibility in that area." (Majority Op. 2.) The majority notes that "Detective Adams knew the neighborhood to be a high-crime area and he had made numerous arrests for drugs and trespassing in Mosby Court in his 12 years as a police officer." (Majority Op. 2.) However, it is an unfortunate reality that, in America today, high-crime areas are frequently poor. Thus, by making much of the fact that the events of this case transpired in a "high-crime" area—notably near public housing projects—the majority embarks on the treacherous path of lowering the Fourth Amendment protection afforded to people in low-income areas.

Because the interaction between Black and the police was no longer voluntary when Adams demanded that Black remove his hand from his pocket after Black initially failed to comply, I would hold Black was seized at that time and that the police lacked a reasonable articulable suspicion for seizing and searching Black.

II.

In *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)), the Supreme Court

---

[2]Mosby Court is a large public housing community found in Richmond's East End.

explained that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." Consequently, when examining whether a seizure has occurred, courts analyze whether "'the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen such that he is not free to walk away.'" *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989) (quoting *United States v. Viegas*, 639 F.2d 42, 45 (1st Cir. 1981)); *see also Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). Undoubtedly, when Adams first asked Black where he lived and Black responded, their interaction required no objective verification. However, the inquiry does not end with the constitutionality of the initial encounter. Although police officers may approach individuals on public streets and ask them questions without invoking Fourth Amendment protections, "[s]ome contacts that start out as constitutional may, however, at some unspecified point, cross the line and become an unconstitutional seizure." *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002).

The touchstone of whether a seizure has taken place is the individual's ability to terminate the encounter. *See Hodari D.*, 499 U.S. at 637 (citing *Terry*, 392 U.S. at 19 n.16). When Adams asked Black to remove his hand from his pocket the first time and Black did not respond, Adams asked Black a second time, indicating that his instruction was in essence a mandate, not a mere request. At that point, Black had been seized. Furthermore, when Adams asked Black what was in his pocket, that question was tantamount to a search.

In affirming the district court, the majority upholds the conclusion that Black was seized when Adams told Black to remove his hand from his pocket because Adams did not want to shoot him.[3] I vigor-

---

[3]The entirety of the majority's position relies on the timing of the seizure. In its opinion, the majority writes:

Black argues . . . that when he was seized during that encounter —when Adams ordered Black to take his hand out of his pocket because he did not want to have to shoot him—his Fourth Amendment rights were violated because the officers did not

ously disagree. Adams's interaction with Black went from a brief encounter between a police officer and a citizen to an investigatory stop, requiring the presence of an articulable suspicion, the moment that Black no longer felt able to end the encounter, something which

> have a reasonable suspicion at that time that he had committed
> or was committing a crime.

(Majority Op. 6.) In a footnote, the majority states that I "ignore[ ] the conclusion made by the district court that Black was seized 'when Officer Adams told Black to take his hand out of his pocket because he didn't want to have to shoot him.'" (Majority Op. 6 n.1 (emphasis added).) However, whether a seizure has occurred is a *legal* question, which we review *de novo*. In *United States v. Sullivan*, 138 F.3d 126, 132-33 (4th Cir. 1998) (emphasis added) (internal quotations and citations omitted) (Niemeyer, J. writing for the Court), we explained that

> [t]he test we apply in determining whether a person has been seized for the purposes of the Fourth Amendment is whether, under the totality of the circumstances surrounding the encounter, a reasonable person in the suspect's position would have felt free to decline the officers' requests or otherwise terminate the encounter. Because the test is an objective one, its proper application is *a question of law*.

Thus, what the majority cites as an inviolate district court ruling is actually only a comment made by the district court that "[i]t appears to me that Mr. Black was seized at the point when Officer Adams told Black to take his hand out of his pocket because he didn't want to have to shoot him" and is thereby subject to *de novo* review. (J.A. 148.) Moreover, this statement is not inconsistent with my conclusion that Black was seized *before* he was threatened with the gun. Despite what the majority implies in footnote 1, Black does challenge the order that he remove his hand from his pocket, which occurred prior to the officer's threat to shoot him. In his brief to this Court, Black asserts that "[t]he fact that [he] had his hand closed in his pocket is not a justifiable reason to seize him and order that he remove it." (Appellant's Br. at 17.) Black explains that "Officer Minton admitted that the second time the appellant was not 'asked' to remove his hand. Minton stated that he was 'ordered' to do so." (*Id.*) This statement refers to the second time Black was asked to remove his hand from his pocket and did so, not the instance in which Adams told Black for the third time to remove his hand because Adams did not want to shoot Black.

occurred when he was first asked to remove his hand from his pocket, did not comply, and was asked again. Thus, the record is quite clear that it was not until *after* the seizure occurred and Black was forced to remove his hand from his pocket that he acted at all suspiciously.

III.

After articulating my position that the seizure occurred when Adams asked Black a second time to remove his hand from his pocket, I now examine whether the police had a reasonable articulable suspicion for seizing Black.

This Court has reasoned that "the very point of *Terry* was to permit officers to take preventive action and conduct investigative stops *before* crimes are committed, based on what they view as suspicious—albeit even legal—activity." *United States v. Perkins*, 363 F.3d 317, 326 (4th Cir. 2004) (citing *Illinois v. Wardlow*, 528 U.S. 119, 125-26 (2000)) (emphasis in original). Thus, in assessing whether the officer had a reasonable suspicion, we look to "the totality of the circumstances." *United States v. Cortez*, 449 U.S. 411, 417 (1981).

In analyzing the totality of the circumstances, the majority enumerates six factors it believes justify the search and seizure of Black. (*See* Majority Op. 8-9.) The fourth, fifth, and sixth of these factors occurred *after* the time at which I maintain Black was initially seized. I, therefore, examine the remaining three factors.

The majority cites both the placement of Black's hand and his hesitance to remove his hand from his pocket as circumstances justifying his search and seizure by the police. The relevant precedent of this Circuit, however, does not support this reasoning.

In *United States v. Burton*, 228 F.3d 524, 529 (4th Cir. 2000) (quoting *Bostick*, 501 U.S. at 437), we held that an individual's refusal to cooperate does not on its own create sufficient justification for detention or seizure. We explained:

> There is no evidence in the record that Burton made any moves as Officer Burke approached. He simply continued to

stand by the telephone booth with his hand in his pocket. He
did refuse to talk with the policemen and to remove his hand
from his pocket, but something more is required to establish
reasonable suspicion that criminal activity is afoot. And in
the absence of reasonable suspicion, an officer may not frisk
a citizen merely because he feels uneasy about his safety.

*Id.* In *Burton*, we rejected the officer's explanation that he searched
Burton because Burton failed to respond to questions and to remove
his hand from inside his coat, which made the officer "uneasy." *Burton*, 228 F.3d at 526. Thus, the fact that a man walking home with his
hand in his pocket made Adams "uneasy" absent some other indicia
of criminal activity could not possibly justify a search and seizure, yet
the majority's opinion buttresses its holding on this very faulty tenet.
Under *Burton*, neither the placement of Black's hand, nor his failure
to comply with Adams's initial request to remove his hand from his
pocket justify the search and seizure.

We distinguished *Burton* in our opinion in *United States v. Mayo*,
361 F.3d 802, 806-08 (4th Cir. 2004). In *Mayo*, we held that the officers had a reasonable suspicion to stop and frisk Mayo. *Id.* at 807-08.
In determining the totality of the circumstances, the *Mayo* Court considered that (1) the encounter occurred in a high crime area, (2) Mayo
put his hand in his pocket *after* seeing a marked police car, (3) Mayo
attempted to evade the police, and (4) when confronted, Mayo acted
in a nervous manner. *Id.*

Although the majority chooses to apply *Mayo*, the facts of the present case correspond more closely to *Burton*. Black did not react to the
police: he did not alter his behavior, attempt to avoid the officers, or
act nervously. Unlike Mayo, who put his hand in his pocket *after* seeing the officers and who acted evasively, Black, like Burton, had his
hand in his pocket before he saw the officers and continued doing
exactly what he had been doing—walking home with his hand in his
pocket—after seeing them. Because the only factor this case shares
with *Mayo* is that both incidents occurred in a high-crime area, I
would reverse the district court's finding and apply *Burton*, holding
that a "cupped" hand and a failure to comply with a police request do
not justify a search and seizure.

Absent these other justifications, the majority is left only with the fact that "the encounter occurred in a high-crime area that Detective Adams knew to be a locus of drug — and firearm — related criminal activity." (Majority Op. 8.) However, "[a] 'high crime neighborhood' is not by itself enough to raise a reasonable suspicion." *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987). Quite to the contrary of our precedent, the result of the majority's opinion is that any person walking in a high-crime neighborhood becomes vulnerable to a police search. As mentioned, "high-crime" areas are often low-income areas. By creating zones of lower constitutional protection in poor neighborhoods, the majority, albeit unwittingly, engages in a blatant display of class discrimination of the basest variety. It has never been my understanding of the Fourth Amendment that those with less means likewise receive less constitutional protection as a result of their plight. It is written into the very fiber of our Constitution that the protections granted therein apply equally to all Americans, regardless of whether they are returning home to the grandest of mansions or the humblest of shanties. Such a broad reading of "reasonable articulable suspicion" significantly limits the freedom of people who happen to be in an area deemed "high crime." Surely, the Constitution cannot support such an arbitrary and discriminatory result.